672 F.2d 792
 12 Envtl. L. Rep. 20,728
 STATE OF OREGON, By and Through the DIVISION OF STATE LANDS,
Plaintiff-Appellant,
v.
RIVERFRONT PROTECTION ASSOCIATION, an unincorporated
association; Henry Salot, Sarah G. Salot, Carl
Wilson, Rose Wilson, John E. Jaqua and
Rosemond R. Jaqua, Defendants-Appellees.
 No. 81-3035.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 3, 1982.
Decided March 26, 1982.
 
 Peter S. Herman, Senior Asst. Atty. Gen., Salem, Or., argued, for plaintiff-appellant; William F. Gary, Deputy Sol. Gen., Salem, Or., on brief.
 Donald J. Morgan, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before SNEED, ANDERSON, and REINHARDT, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 This appeal poses the question whether the McKenzie River between river mile 37 and its confluence with the Willamette River was navigable under federal law on February 14, 1859 when the State of Oregon was admitted to the Union. If it was so navigable title to the riverbed vested at that time in the State of Oregon. The district court held that it was not so navigable. We hold that the McKenzie River between river mile 37 and its confluence with the Willamette River was navigable and reverse.
 
 I.
 BACKGROUND
 
 2
 To determine ownership of the riverbed underlying the reach of the McKenzie now in dispute, the appellant, State of Oregon, sought a declaratory judgment that when the State of Oregon was admitted to the Union, the disputed reach of the McKenzie River was navigable. The appellee, Riverfront Protective Association, is an unincorporated association composed primarily of persons owning real property riparian to the McKenzie River. Many of these landowners hold title derived from federal land patents. They threaten to engage in acts that would interfere with plaintiff's ownership of the land.
 
 
 3
 The parties stipulated to a magistrate's trial with the case to be submitted on the pretrial order and briefs. On December 5, 1980, the magistrate issued his findings of fact and conclusions of law as those of the district court. See 28 U.S.C.A. § 636(c) (1981). Thus, the court determined that the McKenzie River was not navigable in 1859, nor was it commercially usable in its ordinary condition. Clerk's Record 28, p. 19. Thereafter, the court entered judgment ordering that plaintiff take nothing and dismissing plaintiff's action on the merits. Clerk's Record 29.
 
 
 4
 The facts are not in dispute. On questions of law, our review is not limited by a duty to defer to the decision of the district court. East Oakland-Fruitvale Planning Council v. Rumsfeld, 471 F.2d 524, 529 (9th Cir. 1972). Jurisdiction in the district court was based on 28 U.S.C.A. § 1331 (1981).
 
 II.
 ANALYSIS
 A. Title to the Riverbed
 
 5
 Upon the admission of a state to the Union, title to lands underlying navigable waters within the state passes from the United States to the state as incident to the transfer to the state of local sovereignty. Therefore, title to the submerged and submersible lands within the state vests in the state subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce. United States v. Oregon, 295 U.S. 1, 14, 55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935). This is so even though the waters in question are wholly within the borders of the state and are not part of a navigable interstate or international waterway. Id.; Utah v. United States, 403 U.S. 9, 10, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971). If the waters are not navigable the title of the United States to land underlying them remains unaffected by the creation of a new state. See United States v. Utah, 283 U.S. 64, 75, 51 S.Ct. 438, 440, 75 L.Ed. 844 (1931); Oklahoma v. Texas, 258 U.S. 574, 583, 42 S.Ct. 406, 410, 66 L.Ed. 771 (1922). As pointed out above, at least some of the defendants-appellees in this case hold titles descended from federal title.
 
 
 6
 Thus, ownership of the riverbed on February 14, 1859 substantially affects its present ownership. Whether the waters within the state are navigable or non-navigable is a federal question. United States v. Oregon, 295 U.S. 1, 14, 55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935); United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926); Brewer-Elliot Oil & Gas Co. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140 (1922).
 
 B. Navigability
 
 7
 A river is navigable under federal law when it is used or susceptible of use in its ordinary condition as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water. The Daniel Ball, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870). The Daniel Ball sounded in admiralty, but the Supreme Court has adopted the same definition in "navigability for title" cases. See, e.g., Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935).
 
 
 8
 In a case decided five weeks after the magistrate's opinion here, we held evidence of transportation of logs by river sufficient, when joined with the other facts of the case, to support a finding of navigability for purposes of federal regulatory jurisdiction under 16 U.S.C. § 796(8) (1976). 1 PugetSound Power & Light Co. v. FERC, 644 F.2d 785, 788-89 (9th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 596, 70 L.Ed.2d 588 (1981) (shingle bolts).
 
 
 9
 We recognized in that case that use of the river need not be without difficulty, extensive, or long and continuous. Id. Like the logs transported down the McKenzie, the shingle bolts in Puget Sound "required nearly constant handling by the drivers to break up jams, free those bolts that were lodged on the banks and shallow areas, and direct them down the main channel of the river." Id.
 
 
 10
 Transportation on the McKenzie may have been somewhat more difficult. In Puget Sound drivers found the work "not difficult," 644 F.2d at 788, whereas on the McKenzie it took substantial logging crews an average of from thirty to fifty days to complete a log drive down the 32-mile reach at issue. Unfavorable circumstances could increase this time to over ninety days. Intractable log jams had to be broken up with dynamite. Too much rain caused uncontrollable flooding; too little exposed gravel bars, boulders, and shoals. Crews might spend three or four days moving logs across a single gravel bar. But notwithstanding such difficulties, thousands of logs and millions of board feet of timber were driven down the river. Significantly, the evidence shows that the logs floated on the McKenzie were much larger than the shingle bolts floated on the White River in Puget Sound and, apparently, the entire volume of traffic also was larger.
 
 
 11
 Nor does the seasonal nature of log drives on the McKenzie destroy its navigable character. While it is true that the Supreme Court has observed that "The mere fact that logs ... are floated down a stream occasionally and in times of high water does not make it a navigable river," United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 698, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899) (italics added), navigation on the McKenzie did not depend on high water. In fact, the river was never used during high water. Cf. 644 F.2d at 788 (White River) (same). During the high-water period of November through March, the river was too swift, deep, and dangerous for logdriving. During the low-water period from July through October, bars, rapids, boulders, and shoals usually prevented log drives. Furthermore, the log drives were not "occasional." Most drives on the McKenzie were held in April, May, and early June over a period of seventeen years. Thousands of logs and millions of board feet of timber were driven down the river. Such use of the McKenzie was not "occasional."
 
 
 12
 Because the parties stipulated that evidence from the late 1800's and early 1900's would be deemed evidence of the river's natural condition on February 14, 1859, only the question of whether the river was navigable in its ordinary, unimproved condition is at issue. The magistrate's findings of fact show that the McKenzie was sometimes temporarily deepened for logdriving by construction of "wing dams." However, these crude dams cannot reasonably be deemed to have altered the natural condition of the river. The same is true of all the other artificial aids to logdriving-log booms, peaveys,[2] "dogs,"[3] two-horse teams, and dynamite-with which log drivers on the McKenzie plied their laborious trade. These rough means facilitated the transport of logs on the McKenzie, but they did not improve the river. Certainly they bear little resemblance to the planned civil engineering projects considered to be reasonable improvements in United States v. Appalachian Electric Power Co., 311 U.S. 377, 417-18, 61 S.Ct. 291, 303-04, 85 L.Ed. 1143 (1940) (improvements for keelboat and steamboat use). Thus, the McKenzie was used in its ordinary condition as a highway for useful commerce.
 
 C. Oregon law
 
 13
 Appellees also assert that, even assuming title vested in the State of Oregon on February 14, 1859, subsequent disposition of title to the riverbed is a question of state law and under that law title to the McKenzie riverbed vests in them as riparians. Due process, they insist, requires that they be compensated if divested of title.
 
 
 14
 We need not address these issues. Although appellees' due process claim was argued in the trial briefs, the trial court did not address the issue. It is outside the scope of the issues as defined in the pretrial order, which was not amended, and we decline to reach it here. Although the previously unsettled question of riparian title to beds of navigable rivers under Oregon law appears to have been authoritatively decided in favor of the state, see State Land Board v. Corvallis Sand & Gravel Co., 283 Or. 147, 159, 582 P.2d 1352, 1360 (1978), this is an issue that initially should be addressed by the district court, which has a better position than do we for interpreting Oregon law. See, e.g., Power v. Union Pacific Railroad Co., 655 F.2d 1380 (9th Cir. 1981); Major v. Arizona State Prison, 642 F.2d 311 (9th Cir. 1981); United States v. County of Humboldt, 628 F.2d 549, 551 (9th Cir. 1980). Therefore we remand to the district court to permit the determination in the way it judges most practicable of how Oregon law affects a riparian's title to the riverbed involved in this case.
 
 
 15
 The judgment of the district court is reversed.
 
 
 16
 REVERSED AND REMANDED.
 
 
 
 [1]
 Navigability for title to riverbeds differs in three important respects from navigability for federal regulatory jurisdiction over power plants under the Commerce Clause. The former must exist at the time the State is admitted into the Union. Also it must exist in the river's ordinary condition, see United States v. Utah, 283 U.S. 64, 75-76, 51 S.Ct. 438, 440-41, 75 L.Ed. 844 (1931); it cannot occur as a result of reasonable improvements. This is not the case in federal power plant licensing. See United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Finally, to support federal regulatory jurisdiction over power plants the river must by statute be, or have been, "suitable for use for the transportation of persons or property in interstate or foreign commerce." 16 U.S.C. § 796(8) (1976). No such "in interstate or foreign commerce" requirement exists when the issue is navigability for title
 
 
 [2]
 A peavey is a long-handled tool with a stout, sharp spike and hook at one end
 
 
 [3]
 A "dog" is a bent spike for driving into logs that have become wedged between boulders or stranded on gravel bars. The dog holds firm under pressure, but releases when struck a quick blow. By using dogs, stranded logs could be pulled free by two-horse teams and released into the current at the critical moment