**STATE OF ALASKA, Plaintiff,**

v.

**UNITED STATES of America, Donald Hodel, Secretary of the Interior; Robert Penford, Alaska State Director, Bureau of Land Management; Ahtna, Inc., and STA–KEH Corporation, Defendants.**

No. A80–359 Civil (Gulkana River).

United States District Court,
D. Alaska.

April 22, 1987.

Harold M. Brown, Atty. Gen., Micheal W. Sewright, Kenneth C. Powers, Asst. Attys. Gen., Dept. of Law, Office of the Atty. Gen., Anchorage, Alaska, for State of Alaska.

Larry Martin Corcoran, Dept. of Justice, Land and Natural Resources Div., General Litigation Section, Benjamin Franklin Station, Washington, D.C., for defendant U.S.

Robert M. Goldberg, Robert M. Goldberg and Associates, Anchorage, Alaska, for defendant Ahtna, Inc.

David C. Crosby, Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., Baily & Mason, Anchorage, Alaska, for amicus curiae Arctic Slope Regional Corp.

### SECOND AMENDED ORDER RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and UNITED STATES' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS

LAUGHLIN E. WATERS, Senior District Judge.

This case raises difficult questions concerning application of the well settled principle that a state is vested with title to the beds underlying navigable waterbodies at the time the state enters the Union. The State of Alaska has filed this suit in part for the purpose of obtaining review pursuant to 43 U.S.C. § 1631 of a determination by the Bureau of Land Management that the lower 30 miles of the Gulkana River is a non-navigable waterway belonging to the United States.[1] Alaska claims that this portion of the Gulkana is navigable and that therefore title to the riverbed has at all times belonged to the State of Alaska. Ahtna, Inc.,[2] to whom the United States transferred purported title to the lower 30 miles of the Gulkana River, is also named by Alaska as a defendant. Presently pending before the court is Alaska's motion for summary judgment and the United States' cross motion for judgment on the pleadings. For the reasons set forth below, the court now grants Alaska's motion and denies the United States' cross motion.

*Background*

The Alaska Native Claims Settlement Act ("ANCSA") permits Native Alaskans to select through regional and village native corporations approximately 44 million acres of public land in Alaska in settlement of aboriginal land claims they had to lands held by the United States at the time Alaska entered the Union. See 43 U.S.C.

---

1. This court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331. *Oregon v. Riverfront Protection Ass'n*, 672 F.2d 792, 794 (9th Cir. 1982). *See infra* note 6.

2. As is discussed *infra*, Ahtna, Inc. is a regional corporation organized under the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq.*, and occupies the area in which the disputed portion of the Gulkana River is located. Sta-Keh Corporation, a village corporation organized under ANCSA, was also a transferee of the title conveyed by the United States and is also named as a defendant in this suit. However, Sta-Keh Corporation and Ahtna, Inc. have since merged, with Ahtna, Inc. being the surviving corporation and successor in interest to Sta-Keh Corporation. Answer of Ahtna, Inc., paragraph VII.

§ 1601 *et seq.* The Alaska Statehood Act, 48 U.S.C. note prec. § 21, permits the State of Alaska to select approximately 103.5 million acres of public land in Alaska. However, under the "equal footing doctrine," *see Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 229, 11 L.Ed. 565 (1845), and its codification in the Submerged Lands Act of 1953, 43 U.S.C. § 1301 *et seq.,* title to the beds of navigable inland waterbodies passes from the United States to the state when the state enters the Union. *Utah v. United States,* 403 U.S. 9, 10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971); *Bonelli Cattle Co. v. Arizona,* 414 U.S. 313, 324 n. 19, 94 S.Ct. 517, 525 n. 19, 38 L.Ed.2d 526 (1973), *overruled on other grounds, Oregon v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *Oregon v. Riverfront Protection Ass'n,* 672 F.2d 792, 794 (9th Cir.1982); *Alaska v. United States,* 754 F.2d 851, 853 n. 3 (9th Cir.), *cert. denied,* 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985). Because title to the beds of navigable waterbodies passed automatically to Alaska at the time of statehood, they are neither available for selection nor chargeable to either the ANCSA or the Alaska Statehood Act entitlements. *See generally* 43 U.S.C. §§ 1602(e), 1610–1611, 1615, 1631 and 48 U.S.C. prec. 21, Sec. 6(a) and (b). Conversely, the beds of non-navigable waterbodies are available for selection and, if selected, are chargeable against the recipient's entitlement. The United States Department of Interior is responsible for processing the State and native corporation selections and for transferring title to them. *See* 43 U.S.C. §§ 1611, 1613 and 48 U.S.C. prec. 21, Sec. 6(a) and (g). In processing native corporation selections, the Bureau of Land Management ("BLM") of the Department of Interior makes administrative determinations of navigability. 43 U.S.C. § 1631(b); 43 C.F.R. 2650.5–1(b) (1983); *see*

*Alaska v. United States,* 754 F.2d 851, 852 n. 2 (9th Cir.), *cert. denied,* 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985).

On May 16, 1979, BLM issued an administrative decision finding the lower 30 miles of the Gulkana River system non-navigable. On June 29, 1979, the United States made an interim conveyance pursuant to ANCSA of the same lower 30 miles of the Gulkana River system to Ahtna, Inc., an ANCSA regional corporation. In response, Alaska, on November 25, 1980, filed the instant suit.

In its pleadings, Alaska alleged that the very possibility the United States might declare the portions of the Gulkana River not conveyed to Ahtna, Inc. non-navigable created a cloud over Alaska's title to those portions of the river. As a consequence, in addition to specifically challenging the conveyance of the lower 30 miles of the Gulkana to Ahtna, Inc., Alaska sought by its suit to quiet title in the entirety of the Gulkana River System. Alaska also sought a declaratory judgment[3], pursuant to 28 U.S.C. § 2201, concerning (1) the navigability of the Gulkana River System and (2) the relevancy of the criteria applied by BLM in making navigability determinations while processing claims under ANCSA to Gulkana River System lands. Alaska has since represented to this court that in the event summary judgment was entered in its favor on the quiet title portion of the suit, Alaska would not elect to pursue the portion of the suit seeking the foregoing declaratory judgment[4]. Alaska's Reply to United States' Opposition to Alaska's Motion for Reconsideration at p. 7; Alaska's Memorandum in Support of Motion for Reconsideration at p. 6.

■ On June 27, 1984, the United States disclaimed pursuant to 28 U.S.C. § 2409a(d) ownership interest in all but the upper

---

**3.** Alaska also seeks a permanent injunction prohibiting the federal defendants from "patenting, conveying, transferring title to, or otherwise disposing of any land, or interest in land, underlying any part of the Gulkana and connected lakes." Second Amended Complaint, paragraph 5, at p. 12. Alaska has not attempted to demonstrate however that issuance of an injunction is

necessary to protect or enforce its substantive legal rights.

**4.** Because the declaratory judgment portion of Alaska's suit is not before the Court on these motions, the Court expresses no opinion as to the merits of the request for a declaratory judgment.

reaches of the Gulkana River System. This disclaimer was confirmed by the court on September 24, 1984. On March 1, 1985, the State of Alaska moved to voluntarily dismiss with prejudice any claim to the remaining upper reaches of the Gulkana River System in which the United States still claimed an interest.[5] This motion was granted on March 4, 1985. As a consequence of the United States' disclaimer and Alaska's voluntary dismissal, no concrete dispute remains between the United States and Alaska as to the ownership of the Gulkana River System and the court is without jurisdiction over the United States with respect to the quiet title portion of Alaska's suit. *See* 28 U.S.C. § 2409a(d). However, the Court retains jurisdiction over the United States pursuant to 43 U.S.C. § 1631 to review the Secretary of Interior's determination that the lower 30 miles of the Gulkana River is non-navigable.[6] *See McIntyre v. United States*, 490 F.Supp. 830 (D.Alaska 1980). Moreover, because Ahtna, Inc. did not join in the United States' disclaimer, a live controversy remains between Alaska and Ahtna, Inc.

5. Alaska had previously withdrawn its claim to a very small portion of the Gulkana. See Alaska's Withdrawal of Claim, filed February 14, 1986.

6. The belated suggestion of the United States that this Court lost all jurisdiction over the United States as a consequence of the disclaimer is without merit. 28 U.S.C. § 2409a(d) provides that jurisdiction of the District Court "shall cease" if the United States disclaims interest in the property at issue "unless [the court] has jurisdiction of the civil action or suit on ground other than and independent of the authority conferred by [28 U.S.C. § 1346(f) (the statutory grant of jurisdiction over quiet title actions involving property in which the United States claims an interest)]." Here the Court has federal question jurisdiction arising under 43 U.S.C. § 1631 and that jurisdiction is independent of the authority conferred by 28 U.S.C. § 1346(f). As a consequence, the disclaimer filed by the United States pursuant to § 2409a(d) does not, by the terms of § 2409a(d), divest this Court of jurisdiction over the United States. It should also be noted that the disclaimer of the United States in no way renders moot Alaska's suit against the U.S. By making its disclaimer the United States did not concede the navigability of the lower 30 miles of the Gulkana River, see "Stipulation Concerning Extent of Gulkana River System Litigation," filed May 2, 1984, nor is there any evidence that BLM has attempted to

as to title to the lower 30 miles of the Gulkana River System. Ahtna, Inc. has joined in the United States' cross motion for judgment on the pleadings. Ahtna, Inc.'s Opposition to Motion for Summary Judgment at pp. 1–2 (filed June 17, 1983).

Conveyance by BLM of a parcel of submerged land to a Native Corporation is subject to *de novo* review in District Court. *See* 43 U.S.C. § 1631(a). The execution of an interim conveyance by BLM conveying a parcel of submerged land is the "final agency action" with respect to a decision by the Secretary of Interior that the water covering the parcel is not navigable. 43 U.S.C. § 1631(b).

### Discussion

As indicated above, resolution of the parties' claims turns on the question of whether the contested 30 miles of the Gulkana River System are "navigable" as that term is defined under federal law. The federal test for navigability was first articulated in *The Daniel Ball*[7], 77 U.S. (Wall.) 557, 563, 19 L.Ed. 999 (1870):

rescind or disavow its determination that the Gulkana is not navigable.

The jurisdiction of this court over Ahtna, Inc. has not been challenged. The same federal question—that of the navigability of the Gulkana River—is raised by Alaska against both Ahtna, Inc. and the federal defendants. Wholly apart from jurisdiction pursuant to 43 U.S.C. § 1631, federal question jurisdiction has been found to exist in title navigability suits. *See, e.g., United States v. Oregon*, 295 U.S. 1, 14, 55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935). This is true even where title to the river bed is not claimed by the federal government, but merely descends from purported federal title. *Oregon v. Riverfront Protection Ass'n*, 672 F.2d 792, 794 (9th Cir.1982). Thus, this court unquestionably has jurisdiction over Ahtna, Inc.

7. Under federal law, there are three instances in which the "navigability" of a waterway must be determined: (1) to establish the parameters of the admiralty jurisdiction of a federal court, *The Montello*, 87 U.S. (20 Wall.) at 438 (1874); (2) to define the scope of federal regulatory jurisdiction conferred by authority of the commerce clause, *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *Puget Sound Power & Light Co. v. Federal Energy Regulatory Comm'n*, 644 F.2d 785 (9th Cir.), *cert. denied*, 454 U.S. 1053, 102 S.Ct. 596, 70 L.Ed.2d 588 (1981); *Gibbons v.*

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade or travel are or may be conducted in the customary modes of trade or travel on water.

See also Utah v. United States, 403 U.S. 9, 10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971).

This much the parties agree on. What the parties disagree about is how the Daniel Ball test should be applied. As the United States would have it, a navigability determination would be a two step process: the first step would be to select the customary commercial watercraft in use in Alaska at the time of statehood (the craft that would be selected is referred to by the United States in its papers as the "magic boat"), and the second step would be to examine the river to determine if it is usable by the craft. The State of Alaska, on the other hand, rejects the first step of the United States' two step process. According to Alaska, navigability is not established by identification of a "magic boat" but rather is established by determining (1) the capability of the waterbody to be used for transportation of people or goods from point to point on the water; (2) whether the watercraft used or capable of being used on the waterbody are customary means of transporting people or goods; and (3) whether the use or susceptibility to use of the waterbody for transporting persons or goods existed in the natural and ordinary condition of the water on the date of statehood.

Careful examination of the positions of the United States and Alaska reveals that the difference between them stems in significant part from differing conceptions of how the Daniel Ball test meshes with the equal footing doctrine. The United States' position assumes that the fact that under the equal footing doctrine navigability "at the time of statehood" determines title means that the elements of the Daniel Ball test concerning susceptibility to use "as a highway for commerce" "in the customary modes of trade and travel" must be applied with reference to the nature of commerce and the customary modes of travel at the time of statehood. Alaska's position, on the other hand, assumes that the requirement of the equal footing doctrine that a waterway must have been navigable at the time of statehood for title to have passed to the state means only that changes which have occurred in the physical configuration of the waterway since the time of statehood are to be disregarded for the purpose of determining title navigability. At this stage of the analysis then the court is confronted with the question of how, if at all, the equal footing doctrine bears on application of the Daniel Ball test for title purposes.

Navigability was originally created as a legal concept for the purpose of distinguishing those portions of a waterbody which could be privately owned from those portions which could not. See MacGrady, The Navigability Concept in the Civil and Common Law, 3 Fla.St.U.L.Rev. 511, 511–512 (1975). At common law, navigable waterbodies belonged to the sovereign who held them as a public trust while non-navigable waterbodies were subject to private ownership.[8] See, e.g., Rex v. Smith, 99

Ogden, 22 U.S. (Wheat) 1, 6 L.Ed. 23 (1824); and (3) to establish title to the waterbed underlying an inland waterway. Martin v. Waddell, 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842).

The Daniel Ball concerned the parameters of admiralty jurisdiction, not title to the beds of inland waterways. Nevertheless, because the Supreme Court has consistently employed the Daniel Ball test in determining "navigability for title," see, e.g., Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935); United States v. Utah, 283

U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931), it is well settled that that test applies in title navigability cases. Alaska v. United States, 754 F.2d 851, 853 (9th Cir.), cert. denied, 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985); Oregon v. Riverfront Protection Ass'n., 672 F.2d 792, 794 (9th Cir.1982).

**8.** There is, however, debate as to whether the Crown owned only the beds of waterbodies subject to the "ebb and flow of the tide" or if instead the Crown owned the bed of navigable waterbodies regardless of whether the water-

Eng.Rep. 283, 285 (K.B. 1780) ("The soil of a navigable river belongs to the King."); *see also* MacGrady, *The Navigability Concept,* 3 Fla.St.U.L.Rev. at 583–587. Despite the obvious differences between American and English notions of sovereignty, American courts adopted the English common law principle that navigable waterbodies are held by the sovereign in trust for the public.[9] In *Martin v. Waddell,* 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842), the Supreme Court found that title to navigable waterbodies in the former colonies, formerly held by the King of England in trust for the public pursuant to the common law doctrine. of navigable waterbodies, was by virtue of the Revolution vested in the states. *Id.* at 410; *accord Mumford v. Wardell,* 73 U.S. (6 Wall.) 423, 436, 18 L.Ed. 756 (1867). Thus, as the legal concept of navigability was first transplanted in the original 13 colonies, no violence was done to its underlying purpose: the states stood in the position of the King, holding as a public trust the title to the beds underlying navigable waterbodies.

Other considerations unique to the American system of government came into play when applying the doctrine of title navigability to waterbodies lying outside the original 13 colonies. Under the equal footing doctrine, new states "have the same rights, sovereignty and jurisdiction ... as the original states possess within their respective borders." *Mumford v. Wardell,* 73 U.S. (6 Wall.) 423, 436, 18 L.Ed. 756 (1867); *see also Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 228–229, 11 L.Ed. 565 (1845). These rights include ownership of the lands underlying the navigable waters within the state's boundaries. *Pollard's Lessee,* 44 U.S. (3 How.) at 229 (1845); *Mumford,* 73 U.S. (6 Wall.) at 436 (1867); *Oregon v. Riverfront Protection Ass'n.,* 672 F.2d 792, 794 (9th Cir.1982). Thus, states admitted to the Union after the Revolution, being entitled to the same rights as the original 13 states, were, like the original 13 states, entitled to the beds underlying navigable waterways. *Pollard's Lessee,* 44 U.S. (3 How.) at 228–229; *accord Montana v. United States,* 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1981). In the newly admitted states, however, land not owned by the state generally was owned by the federal government. As a consequence, in the newly admitted states, the concept of navigability served the purpose of distinguishing not public from private, but rather state from federal. It is to

body was subject to the ebb and flow of the tide. *See* MacGrady, *The Navigability Concept,* 3 Fla. St.U.L.Rev. at 569–587. In the Nineteenth century, American and English courts concluded that in England there are no waterbodies beyond the ebb and flow of the tide large enough to be navigable and that as a consequence in England navigable waterbodies and waterbodies subject to the ebb and flow of the tide were co-extensive. *The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 454–455, 13 L.Ed. 1058 (1851); *Murphy v. Ryan,* 2 Ir.R.C.L. 143, 151–153 (1868); *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870). By so concluding, previous cases which held that the Crown held title to the beds of navigable waterbodies were reconciled with cases which had found that the Crown held title only to the beds of tidewaters. The court would note that the assertion that in England there are no waterbodies beyond those subject to the ebb and flow of the tide which are large enough to be navigable seems implausible. *See* MacGrady, *The Navigability Concept,* 3 Fla.St.U.L.Rev. at 571. This, however, is a problem of the English law of title navigability, not the American law of title navigability, because under American law, navigable waterbodies are not limited to those subject to

the ebb and flow of the tide. *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870); *see infra* note 9.

**9.** American courts did not, however, adopt the English definition of navigability, which requires that the waterbody be subject to the ebb and flow of the sea. See note 8, *supra; The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870). American courts declined to adopt the English tidewater test based on the perception that whereas in England no navigable waterbodies were to be found in inland areas unaffected by the tide of the sea, *see supra,* note 8, in the United States "rivers are as navigable for many hundreds of miles above as they are below the limits of tidewater, and some of them are navigable for great distances ... which are not even affected by the tide at any point during their entire length." *The Daniel Ball,* 77 U.S. (10 Wall.) at 563; *see also The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 454–457, 13 L.Ed. 1358 (1851). Thus, the differences between the English and American definitions of navigability stem from perceived differences between American and English geography, and not from differing perceptions as to the legal purpose of the concept of navigability.

be noted though that the public/private distinction still has relevance in the American law of title navigability. Under the Americanized version of the common law doctrine of navigability, by virtue of the rights gained in the Revolution and confirmed by the Constitution, it is the state, as opposed to the federal government, which holds title in public trust of "public waterbodies," and it is through application of the definition of navigability that the determination is made of which waterbodies are public and which are not.

The purpose then of the equal footing doctrine as applied to questions of title navigability is to ensure that all states are vested with the same right of safeguarding "public," that is "navigable," waterbodies. However, this conclusion says nothing about *how* navigability is to be defined. On at least a theoretical level, defining navigability with reference only to the state of commerce at the time of statehood, as the United States urges this court to do, does not undermine the above described policies and purposes of the equal footing and navigability doctrines. If one were to accept the proposition that as the nature of commerce varies notions of what is "navigable" and hence "public" vary accordingly, it would follow that navigability should be determined with reference to the state of commerce at the time of statehood. The fact that each state has an equal right to the title of navigable or public waterbodies does not in and of itself compel the conclusion that the concept of what is "navigable," and hence "public," is static and nonmalleable. In short, while it is clear the equal footing doctrine guarantees all states equal rights in navigable waterbodies, the doctrine does not guarantee that the concept of navigability is static and not subject to change over the years.

However, the United States fails to cite a case that supports the proposition that the elements of the *Daniel Ball* test concerning susceptibility of the waterway to use "as a highway for commerce," "in the customary modes of trade and travel" must be applied with reference to the nature of commerce and "the customary modes of trade and travel" at the time of statehood.

The majority of courts which have applied the *Daniel Ball* test for the purpose of determining title, while careful to note that navigability is to be determined at the time of statehood, have not made or required specific findings with respect to the "customary mode of trade and travel" at the time of statehood. *See, e.g., Utah v. United States*, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); *United States v. Utah*, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931); *United States v. Holt State Bank*, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1925); *Oregon v. Riverfront Protection Ass'n.*, 672 F.2d 792, 795 (9th Cir.1982). There is dictum in a couple of cases which could be construed as supporting the United States' position. *See North Dakota ex rel. Bd. of Univ. and State Lands v. Andrus*, 671 F.2d 271, 278 (8th Cir.1982), *rev'd on other grounds sub nom. Block v. North Dakota ex rel. Bd. of Univ. and State Lands*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) ("... [W]e must bear in mind that the issue is one of potential commercial use and hence navigability at the time of statehood, not in the present day.... [C]anoe travel at the time of North Dakota's statehood represented a viable means of transporting persons and goods."); *Alaska v. United States*, 754 F.2d 851, 854 (9th Cir.), *cert. denied*, 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985) ("... [W]e have liberally construed the phrase 'customary modes of trade and travel on water,' [citations omitted], taking into account transportation methods in use at the time of statehood."). These cases, however, hold nothing more than that the "customary modes of trade and travel" at the time of statehood are relevant to the determination of title navigability. The cases do not hold, as the United States here contends, that a determination of title navigability depends exclusively on the customary modes of trade and travel in use at the time of statehood.

The case which sheds the most light on the relationship between the equal footing doctrine and the *Daniel Ball* title navigability test is *United States v. Utah*, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931).

There, the United States had brought a quiet title action against the State of Utah claiming that portions of the Green, Grand and Colorado rivers were non-navigable. In taking exception to certain findings of navigability made by a special master, the United States argued that the absence of historical evidence of actual use by Indiana, fur traders, or early explorers was "weighty evidence" of non-navigability. Noting that the region at issue was unexplored at the time of statehood, the Supreme Court rejected this argument on the ground that a title navigability determination cannot be made to depend upon the relative development or lack of development of a state at the time of its admission to the Union:

> It is true that the region through which the rivers flow is sparsely settled.... In view of past conditions, the government urges that the consideration of future commerce is too speculative to be entertained. Rather it is true that, as the title of a state depends upon the issue, the possibilities of growth and future profitable use are not to be ignored. Utah, with its equality of right as a state of the Union, is not to be denied title to the beds of such of its rivers as were navigable in fact at the time of the admission of the state either because the location of the rivers and the circumstances of the exploration and settlement of the country through which they flowed had made recourse to navigation a late adventure or because commercial utilization on a large scale awaits future demands. The question remains one of fact as to the capacity of the rivers in their ordinary condition to meet the needs of commerce as these may arise in connection with the growth of the population, the multiplication of activities, and the development of natural resources. And this capacity may be shown by physical characteristics and experimentation as well as by the uses to which the streams have been put.

*United States v. Utah*, 283 U.S. 64, 83, 51 S.Ct. 438, 443–44, 75 L.Ed. 844 (1931).

The holding of the Supreme Court that a state's "equality of right as a state of the Union" is not to be denied because of the state's under-development at the time of statehood undermines the United States' contention that the determination of navigability is limited by "the customary mode of commerce" at the time of statehood. If a state's "equality of right as a state of the Union" is not to be denied because of a state's relative under-development at the time of statehood and if "the question [of title navigability] remains one of fact as to the capacity of the rivers in their ordinary condition to meet the needs of commerce as these *may* arise," (emphasis added), it necessarily follows that neither the extent nor the nature of commerce in the region at the time of statehood is relevant to title navigability determinations. Rather, it appears that the Supreme Court in *United States v. Utah* approached the problem of title navigability with fixed, if unstated, concepts of "commerce" and "ordinary modes of commerce" in mind and simply held that those concepts of "commerce" and "ordinary modes of commerce" were to be applied to the river at issue without regard to the extent or nature of actual past or present commercial development in the region surrounding the river.

It must be noted that the Supreme Court in *United States v. Utah* found only that lack of actual navigation at the time of statehood on a waterbody due to the economic under-development of the region surrounding the waterbody is not evidence of non-navigability; the Supreme Court did not directly address the theoretical possibility that a state's right to the title to beds of navigable waterbodies is itself a relative right which varies according to existing concepts of what constitutes commerce, navigability and publicness. However, to the extent that the Supreme Court did not in *United States v. Utah* reject the application of this malleable concept of navigability in making title navigability determinations, this court, for the reasons set forth below, does.

On a purely theoretical level, the notion that as concepts of what constitutes commerce vary concepts of what is "navigable" vary accordingly has a certain appeal. As

a practical matter, however, if such a malleable definition were given to the concept of navigability, the navigability or non-navigability of waterbodies, and hence title to those waterbodies, would be in constant flux. This would plainly be an untenable result. It might be argued that this problem could be solved by permanently fixing title according to the navigability of the waterbody at the time of statehood. However, by making title a constant while at the same time using a malleable definition of navigability, and hence of title itself, an equally untenable situation results: as the nature of commerce and navigability changed, states would be found to have title to non-navigable waterways and without title to navigable waterways. This is, of course, contrary to what the law provides. Thus, as a purely practical matter, it does not make sense to fix title according to prevailing modes of conducting commerce at the time of statehood.

In sum then, although there is little authority directly on point, the inference to be drawn from existing authority is clearly that the admonition of the equal footing doctrine that title is to be determined at the time of statehood does not mean that the "usual mode of commerce" element of the *Daniel Ball* test must be applied with reference to how commerce was conducted at the time of statehood. In addition, if the malleable, relativistic concept of navigability urged by the United States were adopted, title to waterbodies could not be kept constant without undermining the well established principle that the states hold title to the beds underlying navigable waterbodies. This court consequently concludes that the requirement that title navigability be determined at the time of statehood means only that when making a title navigability determination, the *Daniel Ball* test is to be applied to the physical dimensions and configuration of the river existing at the time of statehood.

Having concluded that the "commerce" and "ordinary modes of trade and travel" elements of the *Daniel Ball* test need not be construed with reference only to the "commerce" and "ordinary modes of trade and travel" in existence at the time of statehood, the court is left with the question of how those elements of the *Daniel Ball* test are to be defined and applied in a given case. Alaska advances in the alternative three independent arguments concerning the application and definition of the commerce element of the test. Alaska's first argument is that the term "commerce" no longer has any application in title navigability determinations. As a fall back position, Alaska argues that commerce is not limited to "freight-hauling" activities, but rather encompasses activities such as fishing, camping, sightseeing, trapping, hunting and governmental activities. As a final alternative, Alaska argues that even if the foregoing non "freight-hauling" activities are not commerce, they constitute relevant evidence of a waterbody's susceptibility to bearing traditional forms of commerce. The United States does not dispute the validity of this third argument, nor does the court. *United States v. Utah*, 283 U.S. 64, 82–83, 51 S.Ct. 438, 443–444, 75 L.Ed. 844 (1931); *Utah v. United States*, 403 U.S. 9, 11, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971). The United States does dispute the first two arguments advanced by Alaska and those arguments will be addressed in turn.

Alaska contends that the key element of the federal title navigability test is not that the waterbody at issue be susceptible to commercial use, but rather that it be susceptible to utilization as a transportation route. At first glance, Alaska's position would seem to be contrary to all existing law. Indeed, the well established federal title navigability test explicitly provides that a waterbody is navigable if it is susceptible to being used as a "highway for commerce," and courts have consistently cited and applied this commercial use requirement when making title navigability determinations.

Nevertheless, the court finds substantial merit in Alaska's position. It is to be noted that the federal test essentially equates the use of a waterbody for transportation and as a "highway for commerce": "... as a highway for commerce, over which ... trade *or* travel may be conducted...."

(emphasis added). This implicit equation between routes for travel and routes for conducting commerce comports with common sense notions of what is required to conduct commerce by means of a waterbody. It is difficult to imagine a situation in which a waterbody is susceptible to use as a transportation route yet not susceptible to use as a highway for commerce. The reverse situation, on the other hand, is not difficult to imagine and indeed is probably always the case: where a waterbody is not susceptible to use as a transportation route, it is highly unlikely that the waterbody is susceptible to use as a highway for commerce. As a practical matter then, requiring only that a waterbody be susceptible to use as a transportation route would rarely, if ever, alter the result of a given application of the *Daniel Ball* test. Although this court would not go so far as to hold that susceptibility to use as a highway for commerce is no longer required under the federal title navigability test, it appears to the court that the travel requirement ordinarily subsumes the commerce requirement and that as a consequence, the travel requirement is indeed "the essence of the federal test." *Utah v. United States,* 403 U.S. 9, 11, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971).

This analysis is supported by the facts and holding of the Supreme Court in *Utah v. United States,* 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971). There the United States contested a finding by a special master that the Great Salt Lake was navigable. The special master had found that the lake had been used by ranchers to transport livestock by boat from the mainland to an island in the lake. The United States contended that use of the waterbody for ranching was not evidence of commercial use. Rejecting this argument, the Supreme Court found that the feature which distinguishes between navigability and nonnavigability is use of the waterbody as a "highway" and that the purpose for which travel is conducted on the waterbody is "an irrelevant detail":

> "The hauling apparently was done by the owners of the livestock, not by a carrier for the purpose of making money.

Hence it is suggested that this was not use of the lake as a navigable highway in the customary sense of the word.... We think that is an irrelevant detail. The lake was used as a highway and that is the gist of the federal test." 403 U.S. at 11, 91 S.Ct. at 1776.

Likewise here, the court finds that the paramount consideration in applying the *Daniel Ball* test is whether the waterbody at issue is susceptible to use as a route for transportation.

By emphasizing the susceptibility of a waterbody to being used as a transportation route when applying the title navigability test, difficult questions regarding how the "commerce" element of the title test is to be applied are resolved in a manner which is both sensible and consistent with the policy considerations underlying the title navigability test. The nature of commerce and the manner in which it is conducted varies substantially from historical period to historical period and from geographical region to geographical region. As a consequence, emphasis of the "commerce" element of the title navigability test would lead to widely varying results depending on where and when the title test was applied. This, as demonstrated above, is an undesirable result because it would undermine the stability of title determinations as well as the equality of the states' right to hold the title in public trust. By emphasizing the capability of the waterbody to serve as a route for transportation, these problems are avoided. Regardless of region or historical period, craft capable of providing transportation must be of a certain minimum size. Assuming, as this court does, that a waterbody capable of serving as a transportation route is in the ordinary case also susceptible to use as a highway for commerce, the task then of a court in applying the "highway for commerce" element of the *Daniel Ball* test is much simplified. When determining the title navigability of a waterbody in this manner a court need not specifically concern itself with when and how commerce has or could be conducted in the region surrounding the waterbody; rather the

court need only inquire if the waterbody is susceptible to the most basic form of commercial use: the transportation of people or goods.

The effect of equating a waterbody's susceptibility to use as a transportation route and its susceptibility to use as a "highway for commerce" is to define commerce in its most elemental form and disregard the regional and historical variations in the manner in which it is conducted. There is nothing, however, in the historical development of the title navigability test that indicates that navigability should depend on the regional and historical characteristics of the commerce conducted in the area surrounding the waterbody. As pointed out above, the concept of navigability was developed to distinguish that which can be privately owned from that which is to be held in public trust by the sovereign. Underlying the use of the concept of navigability to distinguish between public and private is the notion that large waterbodies subject to commercial exploitation should be kept public while waterbodies so small as to not be useful for commercial transportation are suitable for private ownership. MacGrady, *The Navigability Concept in the Civil and Common Law,* 3 Fla.St.U.L.Rev. 511, 574–575 (1975). This policy, however, is not served by declaring a waterbody capable of transporting goods non-navigable simply because commerce in the region at that time is customarily conducted in vessels too large for the waterbody. *See, e.g., The Montello,* 87 U.S. (20 Wall.) 430, 441, 22 L.Ed. 391 (1874) ("It would be a narrow rule to hold that … unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway."). This is undoubtedly why the *Daniel Ball* test provides that a waterbody need only be "susceptible" to use as a highway for commerce. As pointed out above, when a waterbody is susceptible to use as a conduit for transportation of any substantial sort, it generally will also be susceptible to use as a highway for commerce.

■ Alaska's second argument, is, as indicated above, that "commerce" is not limited to freight hauling activities, but rather encompasses activities such as fishing, camping, sightseeing, trapping, hunting and governmental activities such as surveying and enforcement of game laws. As the court understands it, Alaska's argument here is not that these are activities which when conducted on a waterbody are evidence of commercial use of the waterbody. Rather, it appears that Alaska is arguing that utilization of a waterbody as an artery of transportation for the purpose of conducting these activities constitutes use of the waterbody as a "highway for commerce." So construing Alaska's argument, the analysis applied by the court with respect to Alaska's first argument is equally applicable here: when a waterbody is susceptible to being used as a route for transporting people or goods, it generally will also be susceptible to use as a "highway for commerce." Again, in the court's view, in the ordinary case there is no material difference between susceptibility to use as a route of transportation and susceptibility to use as a "highway for commerce." As a consequence, it is unnecessary for the court to decide if utilization of a waterbody as an artery of transportation for the purpose of reaching fishing, trapping or game spots is actual use of the waterbody as a "highway for commerce" or merely evidence of the waterbody's susceptibility to use as a "highway for commerce"; where a waterbody is used as a transportation route, for whatever purpose, ordinarily the waterbody will also be susceptible to use as a highway for commerce. As is well established, susceptibility of a waterbody to use as a highway for commerce in the absence of actual use as a highway for commerce suffices to establish navigability. *United States v. Utah,* 283 U.S. 64, 83, 51 S.Ct. 438, 443–444, 75 L.Ed. 844 (1931). The court does note, however, that when a waterbody is utilized as a means of transportation for conducting some of the activities referred to in Alaska's second argument there may be instances when there is no longer an essential equivalence between use of the waterbody as a route of transportation and the susceptibility of the waterbody to use as a "highway for com-

merce." It is easy, for example, to imagine a situation in which a fishing or trapping site near a waterbody could be reached only with a single person kayak. Because it is doubtful whether commerce can be conducted in a single person kayak, the fact that the waterbody was used as a highway for reaching the fishing or trapping spot might not necessarily support a finding that the waterbody was susceptible to use as a highway for commerce. In such a case, it would then be necessary to decide the issue of whether utilization of a waterbody as a "highway for reaching fishing spots" is the equivalent of utilization of the waterbody as a highway for commerce. The facts of this case are not such that the court need decide this issue.

■ In sum then, the title navigability of a particular waterbody is not dependent on the nature of commerce conducted in the region surrounding the waterbody at a given time. A waterbody which is capable of transporting people or goods will in the ordinary case also be susceptible to use as a "highway for commerce." With these precepts in mind, the court now turns to the facts of this case.

Ahtna, Inc. and Alaska have entered into extensive stipulations of fact concerning the physical configuration of the portion of the Gulkana River here at issue and the uses to which it has been put [10]. These factual stipulations provide more than a sufficient basis for applying the legal principles the court has concluded to be applicable in this case. Consequently, resolution of this case on the cross motions before the court is appropriate. *See Oregon v. Riverfront Protection Ass'n.*, 672 F.2d 792, 794 (9th Cir.1982).

In view of the stipulated facts, there is no question that the portion of the Gulkana River here at issue (hereinafter the court will refer to the portion of the river at issue as simply "the river" or "the Gulkana") is capable of transporting people and goods and consequently is "susceptible to

use as a highway for commerce." Much of the river is ordinarily slow moving and 3–6 feet deep and about 150 feet wide. Other areas are characterized by unbroken, comparatively fast running (2–3 m.p.h.) waters 2–4 feet deep under average conditions. These stretches are interrupted by shorter segments of alternating riffles and pools. In a three mile stretch between points 7.5 miles and 10.5 miles above the river's confluence with the Copper River there are segments ranging from just a few feet to a couple hundred feet in length which contain standing waves up to three feet high, capable of swamping an open canoe in places and requiring maneuvering to avoid. These waves are no obstacle to other more stable watercraft such as riverboats and inflatable rafts which are larger and wider than canoes.

The shallowest spot reported is a gravel shoal area a couple hundred feet long located about a quarter mile above the Richardson Highway Bridge (3.75 miles above the Gulkana's confluence with the Copper River) crossing the Gulkana River. At this spot the water depth is normally about a foot and a half deep, and it can drop down to a foot during low water conditions which sometimes occur after mid-July. Just below the Richardson Highway Bridge, there is another gravel shoal maybe 50 feet long where the deepest channel, to the right side of the river heading downstream, is normally about two feet deep. The water level at this spot sometimes drops to 16–18 inches after mid-July and at times drops another 3 to 4 inches in late August or September. Below this point the entire river slows and is several feet deep as it approaches its confluence with the Copper River.

■ There could be some question as to whether the river is navigable in its shallowest spot, that is, the couple of hundred feet stretch above the Richardson Highway Bridge where the water is normally only a

---

**10.** While the United States has not joined in this stipulation, it has represented to the court that it is "willing" to do so. United States' Opposition to Alaska's Motion for Reconsideration at p. 7. Whether the United States does or does not actually join in the stipulation is not crucial however because the United States has not disputed Ahtna's and Alaska's description of the physical characteristics of the lower 30 miles of the Gulkana.

foot and a half deep and at times only a foot deep [11]. This stretch, however, is very short and neither the United States nor Ahtna, Inc. has produced any evidence that navigation over this stretch is not possible. Moreover, it is well established that "navigability, in the sense of the law, is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages." *Economy Light & Power Co. v. United States,* 256 U.S. 113, 122, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921); *accord North Dakota ex rel. Bd. of Univ. and School Lands v. Andrus,* 671 F.2d 271, 277 (8th Cir.1982), *rev'd on other grounds sub nom. Block v. North Dakota ex rel. Bd. of Univ. and School Lands,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983); *United States v. Utah,* 283 U.S. 64, 86–87, 51 S.Ct. 438, 444–445, 75 L.Ed. 844 (1931); see *United States v. Holt State Bank,* 270 U.S. 49, 56–57, 46 S.Ct. 197, 199–200, 70 L.Ed. 465 (1925) (waterbody at issue found navigable despite difficulties to navigation posed by sand bars and vegetation); *Oregon v. Riverfront Protection Ass'n.,* 672 F.2d 792, 795 (9th Cir.1982) (portion of McKenzie river found navigable as a matter of law despite fact that portion of river at issue at times had exposed gravel bars, boulders and shoals). Thus, even assuming that navigation of the short stretch of shallow water above the Richardson Highway Bridge might be difficult, the impediment to navigation posed by the stretch is not of sufficient magnitude to compel a finding that the river is non-navigable.

**11.** It is axiomatic that navigability is a question of fact, *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870), and that as a consequence analogies to other waterways found to be navigable are not always helpful. Nevertheless, the court would note that even the most difficult passage of the portion of the Gulkana at issue here compares favorably with waterbodies found to be navigable in other cases. *See, e.g., North Dakota ex rel. Bd. of Univ. and School Lands v. Andrus,* 671 F.2d 271 (8th Cir. 1982), *rev'd on other grounds sub nom. Block v. North Dakota ex rel. Bd. of Univ. and School Lands,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (Little Missouri River found navigable despite report that maximum depth of river was two and one-half feet).

**12.** Ahtna, Inc. and Alaska have stipulated that the "natural and ordinary condition of the [Gulkana Rivers System] is the same now as it was

Any concern that any segment of the river is non-navigable is put to rest by the evidence concerning the various uses that have actually been made of the river. The first reported use [12] of this section the Gulkana River is one told by Ahtna Natives of a short-statured Gulkana area chief who traded copper for furs with the Tanana people at Isabel Pass (9 miles north of Paxson Lake), had the furs loaded into Native boats, and then transported them down the Gulkana River to a village for redistribution to other Ahtna groups in the Copper River Valley. The village was reportedly located at the combined mouths of Bear Creek and the Gulkana River, about 2.3 miles above the river's confluence with the Copper River. This story, set in the late 1700's or early 1800's, is not documented, but is considered historical by the Ahtna who tell it. It is known that for the period of the story the Ahtna had villages and hunting camps within the Gulkana River drainage, that inter-tribal trade existed between the Ahtna and other native groups, and that the commonly shared Ahtna technology included canoe-type craft constructed of birch bark or animal skins sewn together over a wooden frame. These crafts were customarily about 17 feet long, 4 feet wide and 2 feet deep. The craft were primarily used for down stream travel.

Today watercraft are commonly used within this 30 mile section of river in connection with the fishing and camping activi-

at statehood in terms of location and general physical characteristics such as water volume, gradients, geology and general weather and water level conditions." Stipulation of Facts, filed November 21, 1984, at p. 8. There is nothing in the record to indicate that the physical characteristics of the Gulkana were at any time prior to statehood significantly different than they are at present. As a consequence, when considering evidence of actual use of the Gulkana in determining whether the Gulkana was susceptible at the time of statehood to use as a "highway for commerce," it is irrelevant when the actual use occurred. *Oregon v. Riverfront Protection Ass'n,* 672 F.2d 792, 795 (9th Cir.1982); *see Utah v. United States,* 403 U.S. 9, 9–10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971); *United States v. Utah,* 283 U.S. 64, 82, 51 S.Ct. 438, 443–444, 75 L.Ed. 844 (1931).

ties which take place within the river corridor. Travel on this section is most frequently between the Sourdough Campground (33 miles above the confluence of the River with the Copper River) and the Richardson Highway Bridge, which provide access to the river by road. Use of watercraft between the bridge and the confluence of the river with the Copper River is also prevalent. These river stretches are customarily used, and susceptible to use, by the following craft: (1) powered square-sterned flat-bottomed riverboats and skiffs and V-nosed round bottomed lake boats, most commonly constructed of aluminum but also fiberglass or wood, between 16 to 24 feet long by 4 to 10 feet wide, capable of carrying loads ranging between 900 and 2,000 pounds on the river, with the draft for the metal boats of this type commonly running between 3–6 inches unloaded and 2–4 inches more when loaded to capacity and sitting still in the water, and powered by contemporary jet units, large outboard propeller motors or air propeller engines which can reduce or increase the real draft of the boat once under power; (2) inflatable rafts most commonly ranging between 12 and 15½ feet long and 5 to 7 feet wide, with a river load capacity between 1,250–2,000 pounds and a draft of 6–8 inches when loaded to capacity, and used almost exclusively for downstream travel using rowing frames and oars; (3) square-sterned motorized freight canoes and double-ended paddle canoes 15 to 19 feet long.

Most travel within this section is by recreationalists in their own craft to reach fishing and camping spots on the river between the mouth and Sourdough. Traffic is most pronounced during mid-June through July, while the salmon are running in the river. During a busy weekend day between a dozen and 20 boats carrying 60

or so people are commonly in use within this section. Powerboats are the craft most commonly used, followed by inflatable rafts and canoes.

Facts in addition to the above are stipulated to by Alaska and Ahtna, Inc. It is not necessary, however, to reiterate those additional facts because the facts already recited are more than sufficient to support a finding that the portion of the Gulkana River here at issue is susceptible to use as a highway for commerce, over which trade or travel may be conducted in the customary modes of trade or travel on water[13]. Accordingly, the court, finding the lower 30 miles of the Gulkana River to be navigable as a matter of law, hereby GRANTS the State of Alaska's motion for summary judgment and DENIES the United States' cross motion for judgment on the pleadings.

IT IS SO ORDERED.

---

13. The Gulkana is frozen over approximately six months out of the year. Stipulation of Facts, filed November 21, 1984, at p. 7. However, it is well established that climatic changes rendering a waterbody non-navigable on a seasonal basis do not preclude a finding of overall navigability. *Oregon v. Riverfront Protection Ass'n.,* 672 F.2d 792, 795 (9th Cir.1982); *North Dakota ex rel. Bd. of Univ. and School Lands v. Andrus,* 671 F.2d 271, 277–278 (8th Cir.1982) *rev'd on other grounds sub nom. Block v. North Dakota ex rel. Bd. of Univ. and School Lands,* 461 U.S. 273, 103

S.Ct. 1811, 75 L.Ed.2d 840 (1983). Thus, in light of the above finding that the Gulkana is navigable when not frozen over, it is not necessary for the court to decide whether evidence of ice use can be admitted to prove navigability. The court would observe, however, that the holding of the Ninth Circuit in *Alaska v. United States,* 754 F.2d 851 (9th Cir.), *cert. denied,* 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985), would appear to preclude admission of evidence of ice use.