STATE OF ALASKA, Plaintiff–Appellee,

v.

AHTNA, INC.; and Sta–Keh Corporation, Defendants–Appellants,

and

United States of America; William Clark, Secretary of the Interior; Robert Penfold, Alaska State Director, Bureau of Land Management, Defendants–Appellees.

No. 87–3555.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 1989.

Decided Dec. 13, 1989.

**1402**

Robert M. Goldberg, Robert M. Goldberg & Associates, Anchorage, Alaska, for defendants-appellants.

Kenneth C. Powers, Asst. Atty. Gen., Anchorage, Alaska, for plaintiff-appellee.

Blake Watson, Dept. of Justice, Washington, D.C., for defendants-appellees.

David C. Crosby, Council & Crosby, Juneau, Alaska, for amicus.

Geoffrey Y. Parker, Anchorage, Alaska; Michael W. Sewright, Burr, Pease & Kurtz, Anchorage, Alaska, for amicus.

Jan S. Stevens, Supervising Deputy Atty. Gen., Sacramento, Cal., Robert K. Corbin, Atty. Gen. of State of Ariz., Steven S. Michaels and William M. Tam, Deputy Attys. Gen., Honolulu, Hawaii, Jim Jones, Atty. Gen. of State of Idaho, Neil F. Hartigan, Atty. Gen. of State of Ill., William L. Webster, Atty. Gen. of State of Missouri, Mike Greely, Atty. Gen. of State of Mont., Robert Henry, Atty. Gen. of State of Okl., Dave Frohmayer, Atty. Gen. of State of Or., Kenneth O. Eikenberry, Atty. Gen. of State of Wash., Donald J. Hanaway, Atty. Gen. of State of Wis., Joseph B. Meyer, Atty. Gen. of State of Wyo., for amicus.

Before O'SCANNLAIN, LEAVY and TROTT, Circuit Judges.

LEAVY, Circuit Judge:

## OVERVIEW

The Bureau of Land Management ("BLM") conveyed the lands underlying 30 miles of the lower Gulkana River to Ahtna, Inc. ("Ahtna"), a native regional corporation under the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C.A. §§ 1601–1629(e) (West 1986 & Supp.1989). The district court set aside the conveyance, holding that that segment of the Gulkana was navigable when Alaska became a State in 1959, and therefore, the underlying lands were the property of Alaska, not subject to conveyance by the federal government. Ahtna appeals. We affirm.

## FACTS AND PROCEEDINGS

The facts are not disputed. The Gulkana River System ("the River" or "the Gulkana") is composed of clear water streams located in southcentral Alaska. The River flows through diverse lands containing tundra, spruce forests, and lakes. It displaces 3,600 to 4,800 cubic feet per second from May to September, decreasing to 200 to 300 cubic feet per second from November through April, when the River lies frozen. The parties stipulate that the physical characteristics of the River, such as water volume, gradients, geology, and general weather, are the same as they were when Alaska became a State in 1959.

The part of the River at issue in this case is its lower 30 miles ("the lower Gulkana"), extending from Sourdough Campground (River mile 33.5) to the River's mouth at the Copper River (mile 0). The shallowest part of the River, at mile 3.75, is normally a foot and a half deep, diminishing to a foot during low-flow season. On average, however, the River in these lower 30 miles is 125–150 feet wide and 3 feet deep.

The parties agree that today, between mile 3.75 and mile 30, and between mile 0 and mile 3.5, the River is customarily used, or is susceptible to use, by the following types of watercraft: (1) flat or round-bottom aluminum or fiberglass powerboats 16 to 24 feet long by 4 to 10 feet wide, capable of carrying loads between 900 and 2,000 lbs.; (2) inflatable rafts between 12 and 15.5 feet long by 4 to 7 feet wide, with a load capacity of 1,250 to 2,000 lbs.; and (3) square-sterned motorized freight canoes and double-ended paddle canoes 15 to 19

feet long, capable of carrying loads of 500 to 900 lbs.

In the years immediately preceding Alaska's admission into the Union, from the 1940's to 1959, hunters and fishermen travelled the River in powered 16 to 24–foot fiberglass and aluminum watercraft. The watercraft had a load capacity of approximately 1,000 lbs.

Most of the use of the River is recreational. On a typical busy weekend day in June or July, 20 boats will use the lower 30 miles of the River, carrying approximately 60 people.

Since the 1970's it has been possible to take guided fishing and sightseeing trips on the River. The industry employs watercraft of the type stipulated to be customarily used in the Gulkana, that is, 20 to 24–foot long aluminum powerboats and 12 to 15.5–foot long inflatable rafts. Today, the industry employs over 400 people. Rafts usually carry five passengers and one guide, providing for a load often in excess of 1,000 lbs. Average fare is $150.00 per passenger.

On May 16, 1979, the BLM made an administrative decision finding that (1) the lower Gulkana River was not navigable, and (2) that the underlying submerged lands were federally-owned property subject to conveyance to village corporations under ANCSA.[1] *Alaska v. United States,* 662 F.Supp. 455, 456–57 (D.Alaska 1987). The BLM thereafter made an interim conveyance of the submerged lands of the lower Gulkana to Ahtna, a native regional corporation organized under ANCSA.[2]

The State of Alaska challenged the conveyance to Ahtna. States generally hold title to the lands underlying navigable rivers within their boundaries. *Utah v. United States,* 482 U.S. 193, 196, 107 S.Ct. 2318, 2320, 96 L.Ed.2d 162 (1987). Alaska main-

tained before the district court that the lower Gulkana was navigable, that title to the underlying lands belonged to Alaska, and that the BLM's conveyance was therefore void. *Alaska v. United States,* 662 F.Supp. at 456. The parties stipulated to all the relevant facts.

The district court granted summary judgment in favor of Alaska. The court concluded that in most cases, including this one, a river functions as a "highway for commerce," and therefore is navigable, if it is capable of transporting people or goods. *Id.* at 466. Since the stipulated facts showed that the lower Gulkana has been and is used for transport of goods and people, the court concluded the portions of the River here at issue were navigable. *Id.* at 467–68.

Ahtna appeals. The United States, which before the district court endorsed the BLM's determinations of nonnavigability, now argues as an appellee that the lower Gulkana is navigable but for reasons other than those stated by the district court. Amicus Arctic Slope Regional Corporation joins Ahtna in support of a determination of nonnavigability. Amici, affiliates of the National Wildlife Federation, outdoor sports organizations, and several States, join the State of Alaska in support of a decision of navigability.

### STANDARD OF REVIEW

The facts are undisputed. We review de novo the granting of summary judgment in favor of Alaska. *Gabrielson v. Montgomery Ward & Co.,* 785 F.2d 762, 764 (9th Cir.1986).

### DISCUSSION

I. The Navigability Determination

■ The several States ordinarily hold title to the lands underlying navigable riv-

1. ANCSA was designed to provide a fair and just settlement of land claims by Alaska natives, 43 U.S.C. § 1601(a), following ANCSA's extinction of aboriginal titles. 43 U.S.C. § 1603. To accomplish the settlement, ANCSA withdrew certain lands from appropriation under the public land laws and the Statehood Act, and made these lands available for selection by Alaskan village corporations. 43 U.S.C. §§ 1610, 1611.

Conveyance of the lands to the corporations followed selection. 43 U.S.C. § 1613.

2. The interim conveyance was made to Sta–Keh Corporation, a village corporation. Sta–Keh subsequently merged with Ahtna, a regional corporation, making Ahtna the title-holder.

ers within their boundaries. Two sources of authority justify this rule. One is the "equal footing doctrine," which guarantees to newly-admitted States the same rights enjoyed by the original thirteen States and other previously-admitted States. *Utah v. United States*, 482 U.S. at 196, 107 S.Ct. at 2320; *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 228–29, 11 L.Ed. 565 (1845). One of these rights is title ownership to the lands underlying navigable rivers. *Utah v. United States*, 482 U.S. at 196, 107 S.Ct. at 2320; *see also United States v. Alaska*, 437 F.2d 1081, 1084 (9th Cir.1971).

The second source of authority for the rule is the Submerged Lands Act of 1953. By that act, Congress vested in the States "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States." 43 U.S.C. § 1311(a) (1982). Congress explicitly provided for this rule to apply to Alaska when Alaska became a State in 1959. 48 U.S.C. Chapter 2 ("the Statehood Act") note 6(m) prec. sec. 21 (1982).

Thus, the dispositive issue before the district court was whether the lower thirty miles of the Gulkana were navigable. If navigable, title to the submerged lands passed to Alaska at statehood, and the BLM was without power to convey the lands to Ahtna. If non-navigable, the lands remained federal and available for conveyance to Ahtna under ANCSA.

Whether a river is navigable is a federal question. *United States v. Holt State Bank*, 270 U.S. 49, 55–56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926). The relevant navigability test states as follows:

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are suscepti-ble of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

*The Daniel Ball*, 77 U.S. (19 Wall.) 557, 563, 19 L.Ed. 999 (1870); *see, e.g., Oregon v. Riverfront Protection Ass'n*, 672 F.2d 792, 794 (9th Cir.1982).[3] Although the river must be navigable at the time of statehood, *United States v. Utah*, 283 U.S. 64, 75, 51 S.Ct. 438, 440, 75 L.Ed. 844 (1931) (footnote omitted), this only means that, at the time of statehood, regardless of the actual use of the river, the river must have been susceptible to use as a highway for commerce. *Id.* 283 U.S. at 83, 51 S.Ct. at 443.

A river's use "need not be without difficulty, extensive, or long and continuous" for the river to be a highway for commerce. *Riverfront Protection*, 672 F.2d at 795 (portion of the McKenzie River found navigable when used to transport "thousands of logs," even though shallow areas and sand bars made the transport difficult). It is not essential that the river be used for the transportation of water-borne freight by a carrier whose purpose is to make money from the transportation. *Utah v. United States*, 403 U.S. 9, 11, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971) (ranchers transporting own cattle from mainland to islands used the river as a highway). Indeed, it is not even necessary that commerce be in fact conducted: "The question of ... susceptibility in the ordinary condition of the rivers, rather than of the mere manner or extent of actual use, is the crucial question.... The extent of existing commerce is not the test." *United States v. Utah*, 283 U.S. at 82, 51 S.Ct. at 443.

---

**3.** The parties agree the district court misquoted the *Daniel Ball* navigability test, substituting "trade or travel" for "trade and travel." *Alaska v. United States*, 662 F.Supp. at 463. The district court reasoned from this disjunctive that there was an "implicit equation between routes for travel and routes for conducting commerce," *id.* at 463–64, and that "the travel requirement is indeed the essence of the federal test." *Id.* at 464 (quotation omitted). However, the Supreme Court has often stated that a river's navi-gability depends on the river's susceptibility to useful commerce. *See, e.g., Holt Bank*, 270 U.S. at 56, 46 S.Ct. at 199 ("channel for useful commerce"); *United States v. Utah*, 283 U.S. 64, 82, 51 S.Ct. 438, 443, 75 L.Ed. 844 (1931) ("highway of commerce"). We therefore do not agree the travel requirement is the essence of the federal test, and our decision to affirm the district court rests on our analysis of the *Daniel Ball* test as including an element of commerce.

■ Ahtna and amicus argue that the principal uses of the Gulkana have always been recreational, and that recreational uses do not support a finding of navigability. This argument is unpersuasive. The test is whether the river was susceptible of being used as a highway for commerce at statehood, not whether it was actually so used.

Under the facts of this case, we think the present use of the lower Gulkana is commercial and provides conclusive evidence of the lower Gulkana's susceptibility for commercial use at statehood. The parties agree that in 1970 guided fishing and sightseeing trips began to be conducted with watercraft customary for that time period. A substantial industry of such transportation for profit emerged in the lower Gulkana, which industry today employs approximately 400 people. To deny that this use of the River is commercial because it relates to the recreation industry is to employ too narrow a view of commercial activity. "[N]avigability is a flexible concept and '[e]ach application of the [*Daniel Ball* test] ... is apt to uncover variations and refinements which require further elaboration.'" *Alaska v. United States*, 754 F.2d 851, 854 (9th Cir.1985) (quoting *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940)).

Our conclusion that the present commercial use of the lower Gulkana provides conclusive evidence of its susceptibility for commerce at statehood follows from the facts stipulated to by the parties. The parties stipulated that the River's physical characteristics have remained unchanged since statehood. They also agreed that the watercraft customary for the River's use at statehood included powered boats with a load capacity of approximately 1,000 lbs. We note that the rafts employed today in the guided and fishing industry have a maximum load capacity of 2,000 lbs. We therefore think that the watercraft customary at statehood could have at least supported commercial activity of the type carried on today, with minor modifications due to a more limited load capacity and rudimentary technology. We therefore conclude that the lower Gulakana was susceptible for use as a highway for commerce at statehood.

## II. Reservation of the Riverbed at Statehood

Assuming the lower Gulkana was navigable at statehood, Ahtna argues on appeal that title to the underlying lands did not pass to Alaska because Congress intended to reserve title to the submerged lands of the lower Gulkana for the United States at the time Alaska became a State. Ahtna's argument is based on note 4 of the Statehood Act, which provides:

> As a compact with the United States said State [Alaska] and its people do agree and declare that they forever disclaim all right and title to any lands or other property not granted or confirmed to the State ... under the authority of this Act, the right or title to which is held by the United States ..., and to any lands or other property (including fishing rights), the right or title to which *may be held* by any Indians, Eskimos, or Aleuts (hereinafter called natives) or held by the United States in trust for said natives....

48 U.S.C. note 4 prec. sec 21 (1982) (emphasis added).

According to Ahtna, note 4 meant to reserve the lands underlying Alaska's navigable rivers because ANCSA later provided that Alaskan natives *may have held* title to those lands, bringing them within the reservation of note 4. *See* 43 U.S.C. § 1603(b) (extinguishing "[a]ll aboriginal titles, *if any*, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas....") (emphasis added).

■ Alaska and amici first contend that Ahtna's argument is not properly before this court because it was raised for the first time on appeal. We discuss the merits of Ahtna's argument because the issue is purely legal and the facts are fully developed. *See Romain v. Shear*, 799 F.2d 1416, 1419 (9th Cir.1986).

■■ Ahtna's argument fails. The federal government has the power to convey a Territory's lands underlying navigable waters prior to that Territory becoming a State, thereby defeating the future State's right to the lands. *Utah v. United States,* 482 U.S. at 197, 107 S.Ct. at 2321. The Government could probably likewise reserve unto itself the same lands prior to statehood. *See id.* at 201, 107 S.Ct. at 2323. Nevertheless, "[g]iven the [federal government's] longstanding policy of holding land under navigable waters for the ultimate benefit of the States, ... [the Supreme Court will] not infer an intent to defeat a State's equal footing entitlement from the mere act of reservation itself." *Id.* at 202, 107 S.Ct. at 2323. The party seeking to defeat the State's interest has to show that (1) Congress clearly intended to include land under navigable waters within the federal reservation, and (2) Congress affirmatively intended to defeat the future State's title to such land. *Id.*

In *Utah v. United States,* the Court decided whether the federal government had effectively reserved for itself the bed of the Utah Lake by laws enacted prior to statehood. To meet the first prong of the test, the Court required clear reference to the particular lands in the respective legislation. The court noted that " 'Congress has never undertaken by general laws to dispose of' land under navigable waters." *Id.* at 203, 107 S.Ct. at 2324 (quoting *Shively v. Bowlby,* 152 U.S. 1, 48, 14 S.Ct. 548, 566, 38 L.Ed. 331 (1894)). The bed of Utah Lake was therefore not reserved by a law purporting to reserve " 'all the lands which may hereafter be designated or selected ... for sites for reservoirs.' " *Id.* at 198, 107 S.Ct. at 2321 (quoting the Sundry Appropriations Act of 1888, 25 Stat. 505). The law's generality was not cured by the fact that, prior to Utah's statehood and pursuant to the reservation law, a United States Geological Survey reported the reservation of the "site of the Utah Lake" pursuant to the reservation law, but not *the bed* of the lake.[4] *Id.* at 199, 206–07,

107 S.Ct. at 2322, 2325–26. The Court concluded that other references to the bed of the lake did not unambiguously reflect congressional intent to reserve the bed of the lake, and so failed to definitely declare "or otherwise [make] very plain" Congress' intention to reserve title to the submerged lands. *Id.* at 207, 107 S.Ct. at 2326 (quotation omitted).

Ahtna contends that note 4 reserves title to the lands underlying Alaska's navigable rivers to the United States. We are not persuaded that such interpretation of note 4 could survive the first prong of the test articulated in *Utah v. United States.* Note 4 not only omits specific reference to the lands underlying the lower Gulkana, it also omits reference to any submerged lands. Thus, note 4 embodies too general a statement from which we could "infer an intent to defeat [Alaska's] equal footing entitlement." *Utah v. United States,* 482 U.S. at 202, 107 S.Ct. at 2323. We need not reach the issue of whether note 4 would survive the second prong of the test. *See id.*

## CONCLUSION

We will not infer congressional intent to deprive Alaska of its title to submerged lands of navigable rivers within its boundaries based on the general language contained in note 4 of the Statehood Act. Because the lower Gulkana was susceptible for use as a highway of commerce at statehood, the lower Gulkana was navigable, and title to its submerged lands vested in Alaska at statehood.

AFFIRMED.

---

**4.** The reservation law was subsequently repealed, but the repeal did not affect lands already selected, such as the site of Utah Lake.

*Utah v. United States,* 482 U.S. at 199, 107 S.Ct. at 2322.