JUSTICE RICE,
dissenting.
¶174 I believe the Court has erred in its analysis of the law governing title navigability and also failed to properly apply the tenets of summary judgment by disregarding genuine material factual conflicts.
¶175 M. R. Civ. P. 56(c) provides that summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” The party moving for summary judgment “has the initial burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law.” Noe v. City of Missoula, 2009 MT 417, ¶ 14, 354 Mont. 1, 221 P.3d 1200 (citations omitted). “A material fact is a fact that involves the elements of the cause of action or defenses at issue to an extent that necessitates resolution of the issue by a trier of fact.” Corp. Air v. Edwards Jet Ctr., 2008 MT 283, ¶ 24, 345 Mont. 336, 190 P.3d 1111 (quoting Arnold v. Yellowstone Mt. Club, LLC, 2004 MT 284, ¶ 15, 323 Mont. 295, 100 P.3d 137). After the moving party meets its burden, the nonmoving party then bears the burden to establish that a genuine issue of material fact exists. Roe, ¶ 14. This burden is to demonstrate “by more than mere speculation that a genuine issue of fact exists.” Willden v. Neumann, 2008 MT 236, ¶ 13, 344 Mont. 407, 189 P.3d 610.
¶176 To determine whether PPL created a genuine issue of material fact by more than mere speculation, it is first necessary to outline the legal principles which govern the dispute and which establish entitlement to a judgment as a matter of law. Under the Equal Footing Doctrine, Montana gained title at the time of statehood to all submerged lands under navigable waters. See Pollard’s Lessee v. Hagan, 44 U.S. 212, 229 (1845); see also 43 U.S.C. § 1311(a). Navigability is a question of federal law, and in determining whether “rivers are navigable in law,” courts must first determine whether rivers are “navigable in fact.” Mont. Coalition for Stream Access, Inc. v. Curran, 210 Mont. 38, 43, 682 P.2d 163, 166 (1984) (citing The Daniel Ball, 77 U.S. 557 (1870)); see also U.S. v. Holt State Bank, 270 U.S. 49, 55-56, 46 S. Ct. 197, 199 (1926). The elements necessary to establish navigability are: “(1) [the river] was used or was susceptible *463 of being used, (2) as a highway of useful commerce, (3) in its natural and ordinary condition, and (4) by the customary modes of trade and travel at the time of statehood.” N.D. ex rel. Bd. of U. and Sch. Lands v. U.S., 972 F.2d 235, 238 (8th Cir. 1992) (citing Holt State Bank, 270 U.S. at 56, 46 S. Ct. at 199). If the facts presented substantiate all of the above elements, then title to the streambeds passed to Montana at statehood. See Pollard’s Lessee, 44 U.S. at 228-29. If, on the other hand, the facts fail to satisfy one of these elements, then title to the streambeds did not pass to Montana. See Shively v. Bowlby, 152 U.S. 1, 26-27, 14 S. Ct. 548, 557-58 (1894).
¶177 While this “navigability for title” test has similarities to navigability as determined for exercise of the federal government’s Commerce Clause power, the two tests are nonetheless different-a distinction which the District Court failed to make when relying upon commerce cases, discussed below. It has been explained that “for purposes of establishing title to land pursuant to the rule of state sovereign ownership, the federal navigability test is in fact both broader and narrower than the navigability test for commerce clause purposes.” Water and Water Rights vol. II, § 30.01(d)(3) (Robert E. Beck et al. eds., 3d ed., LexisNexis Supp. 2009). The navigability for title test is broader because rivers need not accommodate “interstate commerce.” Water and Water Rights at § 30.01(d)(3); see also U.S. v. Utah, 283 U.S. 64, 75, 51 S. Ct. 438, 441 (1931). The rivers instead only need to be susceptible to “[i]ntrastate [c]ommerce” because, for example, “the fact that the Great Salt Lake is not part of a navigable interstate or international commercial highway in no way interferes with the principle of public [i.e., state] ownership of its bed.” Water and Water Rights at § 30.01(d)(3)(A) (quoting Utah v. U.S., 403 U.S. 9, 10, 91 S. Ct. 1775, 1776 (1971)).[1] Further, title passes to the states even if there was no “actual use for local commerce,” as “susceptibility to local use” is sufficient. Water and Water Rights at § 30.01(d)(3)(A) (citing The Montello, 87 U.S. 430 (1874)) (emphasis in original). The navigability for title test is also narrower because, unlike navigability as analyzed under the Commerce Clause, navigability for title is determined by a specific time period. “[T]he [navigability for title] test is to be applied as of the time of the Revolution, in the case of the original states, and at the time of admission, in the case of the *464 remaining states, rather than at the time of the litigation.” Water and Water Rights at § 30.01(d)(3). Consequently, because Montana entered the Union on November 8,1889, the courts must apply the navigability for title test at that time, a factual question about which PPL submitted substantial evidence and attacked the State’s case for its failure to do so.
¶178 Importantly-and I believe the Court begins to get off track in its substantive legal analysis here-in applying the navigability for title test, courts are not to assume an entire river is navigable merely because certain reaches of the river are navigable, and likewise, are not to conclude that non-navigable reaches render an entire river non-navigable. See Utah, 283 U.S. at 80-81, 89-90, 51 S. Ct. at 442-43, 446. Instead, courts look to relevant portions of a river and, based upon the facts, determine whether particular reaches at issue are navigable or non-navigable. See Utah, 283 U.S. at 73-74, 51 S. Ct. at 440. In Utah, the federal government brought suit to quiet title to “certain portions of the beds of the Green, Colorado, and San Juan rivers within the state of Utah ....” Utah, 283 U.S. at 71, 51 S. Ct. at 439. The Court referred the case to a special master to make findings of fact, conclusions of law, and recommendations for decree. Utah, 283 U.S. at 72, 51 S. Ct. at 439-40. After making extensive findings of fact with respect to the “topography of the rivers, their history, impediments to navigation, and the use, and susceptibility to use, of the rivers as highways of commerce,” the special master found that some portions of the rivers were navigable while others, such as the forty-mile stretch on the Colorado River located above Lees Ferry, were not. Utah, 283 U.S. at 73-74, 51 S. Ct. at 439-40.
¶179 In its review of the special master’s report, the Utah Court affirmed the propriety of applying a section-by-section analysis, stating “[e]ven where the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken, it may yet be a question, to be determined upon evidence, how far navigability extends.” Utah, 283 U.S. at 77, 51 S. Ct. at 441 (citing U.S. v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 698, 19 S. Ct. 770, 773 (1899)) (emphasis added). The Court thus analyzed whether a reach of roughly four miles, should have been included within the larger reach of water found to be non-navigable, and reversed the special master’s conclusion as to the four-mile reach. Utah, 283 U.S. at 89-90, 51 S. Ct. at 446. The Court thus concluded that the State of Utah owned portions of the river in question which were navigable at statehood, and that the federal government owned *465 the remaining portions. Utah, 283 U.S. at 90-91, 51 S. Ct. at 446. The Court explained it was not concerned with a “short interruption” or “negligible part” of a stream, but with “long reaches with particular characteristics of navigability or nonnavigability”-which meant a reach of four miles in that case. Utah, 283 U.S. at 77, 51 S. Ct. at 441.
¶180 The Court acknowledges that Utah analyzed a roughly four-mile “stretch” of the Colorado River to determine its navigability, but nonetheless concludes that the same section-by-section approach is improper here. Opinion, ¶ 107. Apparently attempting to avoid the consequences of Utah’s application-and of PPL’s considerable evidence-the Court treats Utah’s approach, not as a framework for analysis, but essentially as an anomaly which resulted when the State of Utah challenged the navigability of only four miles and not the remaining thirty-six miles within that reach of the Colorado River which the special master had concluded was non-navigable. See Opinion, ¶ 107. While it is correct that Utah judged only four miles of the River-the reach at issue-to conclude therefrom that Utah does not sanction a sectional approach is an illogical rendering which ignores both the Supreme Court’s approach and the actual result of that case. Utah was a proceeding between Utah and the federal government which ultimately determined that there were two different titleholders to the streambeds of a particular reach of the Colorado River-Utah owned four miles and the federal government owned the remaining thirty-six miles. Utah, 283 U.S. at 74, 90-91, 51 S. Ct. at 440, 446. Contrary to the Court’s view, Utah demonstrates the propriety of applying a section-by-section analysis to determine where navigability begins and “how far navigability extends.” Utah, 283 U.S. at 77, 51 S. Ct. at 441 (citation omitted). Recognizing that navigable and non-navigable reaches may coexist on the same river, the Court refrained from making categorical pronouncements about a river’s status. This section-by-section approach has been used by many courts. See e.g. Brewer-Elliott Oil & Gas Co. v. U.S., 260 U.S. 77, 86, 43 S. Ct. 60, 63 (1922) (“[T]he Arkansas is and was not navigable at the place where the river bed lots, here in controversy, are.” (Emphasis added.)); Alaska v. Ahtna, Inc., 891 F.2d 1401, 1406 (9th Cir. 1989) (only addressing navigability for the “lower Gulkana [River]”); Or. v. Riverfront Protec. Assn., 672 F.2d 792, 793 (9th Cir. 1982) (“This appeal poses the question whether the McKenzie River between river mile 37 and its confluence with the Willamette River was navigable....”); Utah v. U.S., 304 F.2d 23, 26 (10th Cir. 1962) (“[W]e share with the trial court the view that the part of the river in question was in fact and in law non- *466 navigable at the time Utah was admitted into the Union.” (Emphasis added.)); Northwest Steelheaders Assn., Inc. v. Simantel, 112 P.3d 383, 393 (Or. App. 2005) (“[T]he segments of the John Day River at issue here ....” (Emphasis added.)).
¶181 With regard to this substantive issue, PPL argues that “if individual river reaches include non-navigable falls and other obstructions, those reaches are not considered navigable for title.” (Emphasis added.) The Court misstates PPL’s argument on this point, stating that PPL has argued “virtually every stretch of a river must be ‘navigable in fact’ and that particular stretches of a river which are non-navigable due to their physical characteristics can defeat a finding of navigability with respect to the whole river ...” Opinion, ¶ 105 (emphasis added). However, PPL does not make such an overreaching argument. It argues only for certain reaches to be declared non-navigable under Utah’s approach.
¶182 Disturbing to me is that the Court is declaring, as a matter of law, that the reaches claimed by PPL to be non-navigable are simply too “short” to matter. The Court refuses to consider the factual navigability of the disputed reaches of the Missouri, Clark Fork, and Madison Rivers because it deems them to be “relatively short” and presumably, in the words of the Utah Court, mere “negligible parts.” Opinion, ¶ 108. The Court looks at the disputed reaches, calculates their distance, and decides the significance of these distances in order to legally determine the factual question of navigability on each individual river-all while ignoring or rejecting PPL’s evidence that navigability did not, and could not, have existed at the time of statehood. Opinion, ¶ 108. The Court concludes that all of the challenged reaches of all the rivers are “relatively short” and thus unable, as a matter of law, to be declared non-navigable for title purposes. Opinion, ¶ 108. This is opposite to the approach taken in Utah and, critically, is done without the benefit of the extensive factfinding done in Utah on the “topography of the rivers, their history, impediments to navigation, and the use, and susceptibility to use, of the rivers as highways of commerce.” Utah, 283 U.S. at 73, 51 S. Ct. at 439-40.
¶183 The nuances of the test for title navigability underscore the critical nature of the facts and circumstances of each case, and why the Supreme Court has described the issue as one requiring a fact-intensive inquiry. Utah, 283 U.S. at 87, 51 S. Ct. at 445. “Each determination as to navigability must stand on its own facts.” Utah, 283 U.S. at 87,51 S. Ct. at 445. Recognizing this fact-intensive inquiry, *467 PPL submitted a “mountain”-over 500 pages-of affidavits and exhibits demonstrating that the portions of the Missouri, Madison, and Clark Fork Rivers at issue were non-navigable at the time of statehood. This evidence, if accepted after a trial, would lead inevitably to the conclusion that the State did not hold title to the streambeds at issue and was not entitled to receive compensation for their use. Further, PPL provided evidence and critical analysis challenging the State’s position that the relevant portions of the rivers were in fact navigable, summarized by University of Montana Professor David Emmons, who stated that “[h]ad the State been a student of mine at the University of Montana, presenting its brief as a paper on the historical uses of the relevant reaches of the Missouri, Madison and Clark Fork Rivers, it would have received a failing grade for not following the most fundamental tenets of historical analysis.” While the validity and credibility of the State’s evidence would have been, or should have been, determined at trial, PPL’s double-pronged attack serves to demonstrate the significance of the factual issues which exist in this case.
¶184 The law recognizes that “[s]ummary judgment is an extreme remedy that should never be a substitute for a trial on the merits if a controversy exists over a material fact.” Corp. Air, ¶ 24 (citing Mary J. Baker Revocable Trust v. Cenex Harvest, 2007 MT 159, ¶ 17, 338 Mont. 41, 164 P.3d 851). Further, “it is important to note that at the summary judgment stage, the court does not make findings of fact, weigh the evidence, choose one disputed fact over another, or assess the credibility of witnesses.” Andersen v. Schenk, 2009 MT 399, ¶ 2, 353 Mont. 424, 220 P.3d 675. The proper inquiry is not merely whether the State presented sufficient evidence to support a conclusion of navigability as a matter of law; rather, the question is whether PPL created material factual conflicts by way of evidence which was not speculative, thus requiring the navigability question to be decided after trial. I thus turn to the evidence PPL produced for each river in question at the time of statehood.
A. The Madison River
¶185 Initially, it should be noted here that although the Court faults PPL for challenging only “relatively short” reaches, in actuality PPL has challenged the navigability of the entire Madison River. PPL submitted various historical documents in conjunction with an affidavit by Professor Emmons, including a 1931 Report to Congress prepared by the Army Corps of Engineers. Addressing the same stretches of the Madison River which are at issue here, the Army *468 Corps of Engineers concluded that “[a]s far as is known there has never been any navigation on these streams, and commercial navigation on them is entirely out of the question.” (Emphasis added.) Professor Emmons’ analysis brought him to the conclusion, regarding the navigability of the Madison at statehood, that: “It is my opinion as a historian that credible evidence in the form of a report actually prepared by the Corps of Engineers demonstrates that the Madison River was not used or capable of use for commercial navigation.” (Emphasis in original.)
¶186 One maybe inclined to think of the Madison River as currently navigable, and thus PPL asked Dr. Stanley A. Schumm, a fluvial geomorphologist, to evaluate “whether the current physical conditions of the Madison River, with respect to navigability, were the same as or different than the physical conditions at the time of Montana’s admission to the Union in 1889.” Dr. Schumm summarized his analysis in an affidavit:
In my expert opinion, the current physical conditions of the Madison River, with respect to navigability, are not the same as the conditions of the river in 1889 when Montana entered the Union. First, the construction and operation of the hydroelectric projects and reservoirs have materially changed the flow characteristics in the river. It is my understanding that the Madison hydroelectric project, including the reservoir known as Ennis Lake, was constructed over a course of years in and around 1906 and that the Hebgen reservoir project, known as Hebgen Lake, was constructed over a course of years in and around 1912 .... By making the flow lower during periods of high flow and higher during periods of low flow, the operation of the hydroelectric projects and reservoirs have made the river more susceptible now to commercial navigation than it would have been without them. Second, my review of the historical descriptions of the Madison River indicate that the location and number of the river channels have changed since the time of statehood and that relevant portions of the river appear to have been either anastomosing or braided at the time of statehood. Because reaches of the Madison River appear to have been either anastomosing or braided, my opinion is that it was not susceptible to navigation at the time of statehood.
*469 (Emphasis added.)[2] PPL thus contested consideration of the current state of the Madison River in determining its navigability at statehood. For purposes of summary judgment, PPL demonstrated that the Madison River today is not the same as it was at the time of statehood, and that, at that time, it was not navigable.
¶187 PPL did not quit there. As noted above, for each river in question PPL also offered expert analysis which critiqued and sought to undermine the evidence offered by the State. First, PPL claimed that the State’s use of the Lewis and Clark Expedition to prove the navigability of the Madison River at statehood was faulty, asserting that “Lewis and Clark provide no evidence whatsoever regarding the navigability of the Madison River” and that the Expedition proved only “two things: that the Jefferson, Madison and Gallatin Rivers are similar at their mouths and that the Expedition chose not to try to ascend the Madison.” (Emphasis in original.) Second, although the State cited to a single log drive which occurred on a reach of the Madison River, PPL countered that the log drive in question took place between West Fork and Varney — an area which did not encompass the reaches at issue in this case. Further, “[t]he mere fact that logs, poles and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river.” N.D. ex rel. Bd. of U. and Sch. Lands, 972 F.2d at 240 (quoting Rio Grande Dam & Irrigation Co., 174 U.S. at 698, 19 S. Ct. at 773). Third, PPL pointed out that the State’s claim in this lawsuit was contrary to its past position. The State failed to claim title to the relevant reaches of the Madison River streambed in the early 1980s. The Department of State Lands, for example, published a list of rivers that it claimed were navigable, but claimed only one reach on the Madison River: “Based on historical documentation the Madison River is commercially navigable from the confluence of its west fork to Varney, Montana. Therefore the state claims ownership of the Madison River between these two points.” As with the State’s log float evidence, this claimed reach did not cover the *470 current reaches at issue. Because the State’s witness could not explain why the State “now claims the entire Madison as navigable at statehood,” PPL was able to posit that the State had already, at least implicitly, “[a]dmitted” that it did not own the reaches it now claims.
¶188 Fourth, the State relied heavily upon the current use of the Madison River as evidence that the river was susceptible to navigation over 100 years ago. PPL’s evidence and analysis criticized the State’s emphasis of this modern evidence, a position for which there is clear legal support. See N.D. ex rel. Bd. of U. and Sch. Lands, 972 F.2d at 240 (“[Mjodern day canoe use and modern day hoatability’ data are not reliable indicators of the River’s navigability at statehood.”). PPL argued the current use of the Madison River was irrelevant because it could not shed light on the navigability of the Madison River at the time of statehood. Finally, the State presented a 1986 Montana Navigable Water Study prepared by the Heritage Research Center in Missoula for the Department of State Lands. Professor Emmons acknowledged the Study, but opined it was untrustworthy due to its budgetary constraints and flawed historical analysis. The Study itself acknowledged that it was incomplete “[d]ue to the funding limitations,” and explained that “[b]ecause the approach to documenting navigable waterways for title purposes has been constrained by lack of funding, efforts have been focused upon generating the most information for the least possible cost.”[3] Emmons also pointed to problems in the Study’s methodology, noting it was “overly dependent on two of the least trustworthy historical sources to [wjestern historians-frontier-era newspapers and personal memoirs or reminiscences.” Emmons found western frontier-era newspapers were suspect because “they were often vehicles used by local communities to promote the community to possible occupants and business investors ... [and] [f|rontier-era *471 newspaper editors often acted more as unabashed promoters of economic development than unbiased news reports.”[4]
¶ 189 The District Court began by recognizing “[tjhere apparently is little historical documentation regarding the navigability of the Madison River.” The court then quoted and relied upon the 1986 Montana Navigable Water Study-thereby granting validity and credibility to the very Study which was admittedly incomplete and about which Emmons explained was an unreliable source. The court further reasoned that the 1986 Study had referenced a 1913 log float from the mouth of the West Fork of the Madison to Varney and that Hebgen Lake “has been navigated.” As explained above, this log float and the navigability of Hebgen Lake were of no legal consequence because the log drive did not cover the reaches currently at issue and Hebgen Lake did not exist at the time of statehood. See e.g. Riverfront Protec. Assn., 672 F.2d at 794 n. 1 (“Navigability for title ... must exist at the time the State is admitted into the Union. Also it must exist in the river’s ordinary condition .... [I]t cannot occur as a result of reasonable improvements.”) (citing Utah, 283 U.S. at 75-76, 51 S. Ct. at 440-41).
¶190 Disregarding the considerable evidence PPL had presented, the District Court chose to accept the State’s evidence in concluding no genuine issue of material fact existed about the navigability of the Madison River at statehood. Perhaps most disconcerting is the fact that the Study relied upon by the District Court itself acknowledges its work on the issue was incomplete. The District Court thus violated the principles governing summary judgment.
¶191 The Court does the same thing. It first claims that the Report prepared by the Corps of Engineers in the 1930s was merely “conclusory” and “insufficient as a matter of law to raise genuine issues of material fact.” Opinion, ¶ 103. The Court likewise disregards Dr. Schumm’s expert opinion that the current condition of the Madison River is completely different than at the time of statehood. Instead, the Court relies on Ahtna, 891 F.2d at 1403-a case where parties had stipulated the river in question had remained the same since *472 statehood — and Utah, 283 U.S. at 82-83, 51 S. Ct. at 443-44 — a case presenting no factual issue about whether the rivers at issue were different at statehood-to hold “[t]he present-day recreational use is sufficient for purposes of‘commerce’ under Utah and Ahtna.” Opinion, ¶ 104. The Court, like the District Court, has resorted to weighing, and ultimately discrediting: (1) the evidence and analysis clearly demonstrating for summary judgment purposes that the Madison River was non-navigable at the time of statehood, (2) an expert analysis that the Madison River at the time of statehood was completely different than its current form, and (3) historical evidence generated by a U.S. governmental agency. The Court also necessarily dismisses PPL’s analytical attack upon the State’s evidence. I believe these evidentiary issues should be tested at trial-including cross-examination, rebuttal, and by application of the proper burden of proof-and resolved there by the factfinder.
B. The Clark Fork River
¶192 PPL’s evidence concerning the navigability of the Clark Fork River included the 1891 Army Corps of Engineers Report submitted to Congress. After evaluating the Clark Fork River, including the portions at issue here, the Report concluded, “[i]t is a mountain torrential stream, full of rocks, rapids and falls, and is utterly unnavigable, and incapable of being made navigable except at an enormous cost.” (Emphasis added.) The Report characterized the idea of transforming the Clark Fork River into a navigable river as an “absurdity.” About fifty years later, Major Mark Boatner of the Army Corps of Engineers confirmed the observations of the 1891 Report by responding to a request to determine whether the Clark Fork River was navigable:
Receipt is acknowledged of your letter of November 14, 1940, in which you request the opinion of this office as to the navigable status of Clark’s Fork of the Columbia River between Pend O’Reille [sic] Lake, Idaho, and the mouth of the Blackfoot River, a few miles above Missoula, Montana.
For the purpose of administering the laws for the preservation and improvement of navigable waters of the United States, this Department considers Clark Fork navigable from its mouth in Pend O’Reille [sic] Lake to the Northern Pacific Railroad Bridge, a distance of only about four miles.
(Emphasis added.) Major Boatner’s view was that the entire Clark Fork, with the exception of the referenced four-mile reach, was non-navigable. Thus, PPL’s dam, which Professor Emmons explained was *473 “far downstream” from the four-mile stretch, was in waters the Corps considered non-navigable.[5]
¶193 PPL also offered judicial decrees. In 1910, the Federal District Court of Montana concluded the Clark’s Fork of the Columbia River in Sanders County, Montana, which PPL asserts is the location of its dam, “was and is a non-navigable stream incapable of carrying the products of the country in the usual manner of water transportation” and that Northwestern Development Company, not the State, owned the portions of the streambeds at issue before the federal court. Steele v. Donlan, In Equity No. 950 (D. Mont. July 14, 1910).
¶194 Reviewing the evidence, Professor Emmons concluded his analysis by stating, “[CJredible evidence from the Corps of Engineers and the Montana federal court, roughly contemporaneous with statehood, leads me to conclude that the Clark Fork River in Sanders County was not a navigable highway for commerce at statehood.”
¶195 Again, PPL also cast doubt on the evidence offered by the State. The State relied upon a document described as the “Clark Fork Corps Report,” despite the fact it did not contain any “title page or other indication of author, date of preparation, or purpose.” Professor Emmons first criticized the State’s attribution of the Report to the Corps of Engineers:
[The] report[] [was] not prepared by the United States Army Corps of Engineers ... as the State contends, but rather [] [was] prepared for the Corps, and thus do[es] not carry any imprimatur of credibility that might be associated with an actual Corps Report. There is no indication in the evidence provided by the State that the Corps ever adopted the conclusions made or concurred in these so-called “Corps Reports.”
(Emphasis in original.) Emmons then attacked the substance of the Report, stating that it relied on “untrustworthy historical sources ... to reach conclusions regarding historical use of the rivers.” Emmons explained the State’s use of the “Clark Fork Corps Report” was “fallacious in three ways: (a) [the State] has taken secondary sources based on less than credible historical evidence; (b) attributed them to the more authoritative Corps of Engineers; and (c) proffered them as historical evidence of the historical use of the rivers.” Similarly, the State’s reliance on the under-funded 1986 Montana Navigable Water *474 Study was flawed because the Study had mischaracterized an article published in the Missoulian on February 24,1882. The Study claimed logs were floated to Weeksville, Montana, and down the Clark Fork River. However, Emmons quoted the language of the article, which actually stated that Weeksville was “situated near the river in a body of fine timber and when the supply of logs in the immediate neighborhood gives out, they can be floated right to the locality down the Missoula and Pend d’Oreille rivers.” (Misspelling in original, emphasis added by Emmons.) In pointing out the flawed logic in the Study, Emmons opined that “[t]here is a considerable difference historically between a frontier-era newspaper claiming that logs could be floated down a river and credible evidence that logs were actually floated down the river.” (Emphasis in original.) Thus, Emmons concluded that “the State’s evidence lacks the credibility to prove anything about the historical use” of the Clark Fork River. (Emphasis in original.)
¶196 In granting summary judgment to the State, the District Court relied on cases addressing the federal government’s power to regulate commerce under the Commerce Clause. See e.g. Mont. Power Co., 8 F.P.C. 751 (F.P.C. 1949); Wash. Water Power Co., 10 F.P.C. 657 (F.P.C. 1951); Wash. Water Power Co., 14 F.P.C. 731 (F.P.C. 1955). While these commercial, non-title cases admittedly held that the Clark Fork River was navigable at the time of statehood for that purpose, these rulings are of no consequence in light of this case’s procedural posture. This is a title navigability case at the summary judgment stage. PPL set forth clear evidence of non-navigability, and construing that evidence in its favor, we must assume from that evidence-until a trial-that the navigability of the Clark Fork River is a genuine issue of material fact. Instead, the District Court, and now this Court, has taken upon itself the role of factfinder, weighing PPL’s evidence and concluding that it lacks credibility, rendering it mere “conclusory statements.” Opinion, ¶ 103.
C. The Missouri River
¶197 The State claimed that “[a]s anyone with even a passing knowledge of the Lewis and Clark Expedition must concede, the Missouri River is navigable in fact throughout Montana.” PPL begged to differ. Professor Emmons averred that he had “acquired more than a passing knowledge of the Lewis and Clark Expedition during [his] 35 years as a professional historian in Montana. [He knew] that the Expedition did riot navigate the Great Falls Reach of the Missouri *475 because it was impossible for them to do so.” (Emphasis in original.) Emmons explained:
To my knowledge as a professional historian, there has never been any navigation on the Missouri River in the Great Falls Reach because the physical characteristics of the falls prevent it. Captain William Clark prepared a map describing the features of the Great Falls Reach of the Missouri River. On this map, Captain Clark listed fifteen different rapids and nine waterfalls, including the five named waterfalls in this reach: (1) Black Eagle Falls - 26 ft. 5 in. descent, (2) Colter Falls (now submerged) - 14 ft. 7 in. descent, (3) Beautiful Cascade (now named Rainbow Falls) - 47 ft. 8 in. descent, (4) Crooked Falls - 9 ft. descent, and (5) the Great Falls of the Missouri - 87 ft. 3/4 in. descent.
(Emphasis in original.) Further, Emmons cited to an 1896 inquiry by Samuel Hill, who asked the War Department whether a permit was required for maintenance on the dam constructed immediately above Black Eagle Falls on the Missouri River. J.C. Sanford, Captain of the Corps of Engineers, conducted a Report which stated:
The dam referred to is located just above the Black Eagle Falls of the Missouri River, and is 3 1/4 miles below the railroad bridge at the town of Great Falls. About 400 feet above this bridge begins the series of rapids and falls in which the river falls 412 feet in a distance of 11 miles .... This portion of the river can, in my judgment never be made navigable at a cost that the demands of commerce will ever justify.
Relying upon Captain Sanford’s Report, the War Department responded to Mr. Hill’s request, informing him that no permit or action of the War Department was required.
¶198 PPL also provided a Report from the War Department for the Fiscal Year that ended June 30,1898. The Report concluded the reach from Fort Benton to Great Falls was “an unnavigable section occupied by cataracts and dangerous rapids.” It also detailed various navigation improvement projects contemplated for the reach between Great Falls and Stubbs Ferry, within the upper reach of the Missouri, south of Great Falls. The Report estimated that the cost of creating a mere three-foot deep channel from Cascade to Great Falls would be $213,646.50 in 1898 dollars.
¶199 Based upon his review of the evidence, Professor Emmons opined that “credible historical evidence demonstrates clearly that the Great Falls Reach of the Missouri River is not and has never been navigable and that the reach of the Missouri River between Great *476 Falls and Stubbs Ferry would have required post-statehood improvements to support commercial navigation.” See e.g. Riverfront Protec. Assn., 672 F.2d at 794 n. 1 (“Navigability for title ... must exist at the time the State is admitted into the Union. Also it must exist in the river’s ordinary condition .... [I]t cannot occur as a result of reasonable improvements.”).
¶200 Once again, PPL challenged the validity of the State’s evidence on this river. The State had cited to the Missouri Corps Report, which claimed that “fur trappers [ ] plied the waters of the Upper Missouri through territorial days,” and that “[ajfter the discovery of gold, miners and settlers floated the river to Great Falls and Ft. Benton from the Helena area mining districts.” PPL offered Emmons’ assessment:
Besides the fact that the geography of the Great Falls Reach of the Missouri River makes it utterly impossible that these miners actually floated the entire river to Fort Benton, there are considerable historical problems with the source of these reports, Hubert Hugh Bancroft. Bancroft (a nineteenth-century book seller and antiquarian) did not write anything that approaches what the State refers to in its Brief as “historical works generally considered authentic.” He is not an authentic source of historical information. One historian, Kevin Starr, referred to Bancroft: “as a historian, [he] was often ludicrous and sometimes dishonest.” I know of no professional historian who would use Bancroft as a credible historical source, as the State has done.
Emmons perceived that “[i]nstead of relying on more credible sources such as court records, business records or governmental reports, the State relies exclusively on secondary sources that by their own admission are limited in scope and which rely on untrustworthy primary sources to reach their conclusions.” Further, PPL rebutted the State’s legal argument that our previous precedent had established navigability for title purposes of the entire Missouri River. The State had relied upon Gibson v. Kelly, 15 Mont. 417, 39 P. 517 (1895) and Herrin v. Sutherland, 74 Mont. 587, 241 P. 328 (1925), but as PPL correctly pointed out, in neither Gibson nor Herrin had either party contested the issue of navigability for title. Gibson, 15 Mont. at 417, 39 P. at 517; Herrin, 74 Mont. at 594, 241 P. at 330. Thus, this issue had never been previously decided by this Court.
¶201 The District Court dismissed PPL’s evidence and relied upon Mont. Power Co. v. Fed. Power Commn., 185 F.2d 491 (D.C. Cir. 1950), a non-title case, to enter summary judgment in favor of the State. The Court decides similarly, reasoning that PPL has challenged only *477 “relatively short” reaches. Opinion, ¶ 108. In particular, when reviewing the Missouri River, the Court states that “[t]he Great Falls Reach, even though a roughly 17-mile stretch of the Missouri River, is merely a short interruption ....” Opinion, ¶ 108. The Court does not explain why a non-navigable reach running from Fort Benton to Great Falls is too “short,” and how it can so declare as a matter of law without factfinding. These determinations necessarily require a factfinder to consider each interruption in the context of the facts about the “topography of the rivers, their history, impediments to navigation, and the use, and susceptibility to use, of the rivers as highways of commerce.” Utah, 283 U.S. at 73, 51 S. Ct. at 439-40.
¶202 I would agree with the Court that, with respect to all the relevant reaches of the Madison, Clark Fork, and Missouri Rivers, the State met its initial burden to prove navigability under the title test. The Court’s initial statement is thus correct: “The evidence presented by the State was clearly sufficient to demonstrate navigability in fact under this test....” Opinion, ¶ 101. But the summary judgment inquiry is not supposed to end there. Without judgment as to weight or credibility, we are to determine whether PPL raised genuine factual issues by more than mere speculation. Clearly, PPL has done so. There is nothing “insufficient” or “conclusory” about PPL’s evidence. Rather, its evidence is relevant and material. PPL has satisfied its burden to produce substantial evidence that the disputed reaches of the rivers were, at the time of statehood, non-navigable. The Court’s decision to the contrary makes one wonder just what evidence the Court would have considered sufficient for PPL to defeat summary judgment in this case.
¶203 Consistent with the legal standards, this Court has steadfastly guarded against depriving a party of the right to trial by the improper entry of summary judgment. Today, I believe we step back from the protection of that right. I would not do so, but would reverse the District Court’s entry of summary judgment and remand for trial.
DISTRICT JUDGE SALVAGNI joins in the dissenting opinion of JUSTICE RICE.

 Utah v. U.S., 403 U.S. 9, 91 S. Ct. 1775, cited here, is to be distinguished from U.S. v. Utah, 283 U.S. 64, 51 S. Ct. 438. The latter case is the primary authority relied upon herein, and referred to as “Utah.”

 As Dr. Schumm explains later in his affidavit, “An anast[o]mosing river is exemplified by multiple distinct channels. An anastomosing river’s flow is split among the various channels and, as a result, the river stage in an anastomosing reach at a given flow is lower than in a single channel reach.” Dr. Schumm also explains that “[b]raided rivers, unlike anastomosing rivers with their several distinct channels, are characterized by a single main channel with a series interlocking or tangled network of several, smaller branching and reuniting shallow channels separated from each other by islands or channel bars. Braided rivers have high width to depth ratios and relatively steep gradients. The physical characteristics of braided rivers are not conducive to navigation.”

 Budgetary concerns were exactly why the Historical Research Associates (HRA) refused to submit a bid for the Study. HRA informed the State, that it had
extensive experience in this type of research, both for Montana waterways and for waterways in other western states. Based on this experience we are familiar with the amount of time required to provide our clients with a solidly researched and defensible product. Unfortunately, we do not think that we could provide the necessary document given the stated project ceiling and the stipulation that no additional costs incurred would be reimbursed. Therefore, given the Department’s budgetary constraints, HRA is not able to offer a proposal on this project.

 Emmons’ analysis is consistent with what he teaches to his students and writes in his books. In class, “[Emmons] taught [his] students in [a class entitled] The Historian’s Craft that frontier-era newspapers, because of their promotional nature, should never be used as sole primary historical sources as they were used for the [1986 Montana Navigable Water] Study.” (Emphasis in original.) Emmons similarly wrote in his book, Gardens in the Grassland: “[T]he most representative example of the mood of western boomerism ... was the local newspapers. No one ever doubted the press’ commitment to growth or its eagerness to engage in promotional hyperbole.”

 This evidence further undermines the Court’s assessment that PPL is only challenging “relatively short” reaches. With the exception of four miles, the reach claimed here to be non-navigable runs from Missoula, Montana, to Sandpoint, Idaho.